The TUPMAN THURLOW COMPANY,
Inc., et al.,

v.

W. F. MOSS, Commissioner, etc., et al.

Civ. No. 4164.

United States District Court
M. D. Tennessee,
Nashville Division.

March 1, 1966.

Thomas Wardlaw Steele, Gullett, Steele & Sanford, Nashville, Tenn., J. Bradley Colburn and James H. Lundquist,

Barnes, Richardson & Colburn, New York City, for plaintiffs.

George F. McCanless, Atty. Gen., State of Tennessee, Thomas E. Fox, Asst. Atty. Gen., Nashville, Tenn., for defendants.

Edwin F. Hunt, Boult, Hunt, Cummings & Conners, Nashville, Tenn., for defendant intervenor, Tennessee Farm Bureau Federation, Inc.

James M. Glasgow, Glasgow & Elam, Union City, Tenn., for defendant intervenor, Tennessee Livestock Assn., Inc.

John W. Douglas, Harland F. Leathers and Arthur E. Schwimmer, Asst. Attys. Gen., Dept. of Justice, Washington, D. C., and James F. Neal, U. S. Atty., Nashville, Tenn., for the United States as amicus curiae in support of the plaintiff.

Before PHILLIPS, Circuit Judge, and MILLER and GRAY, District Judges.

PER CURIAM.

This action was instituted by the Tupman Thurlow Company, Inc., and the William Davies Company, Inc.,[1] for a declaratory judgment that Chapter 34 of the 1965 Public Acts of Tennessee (See Appendix A), herein referred to as the Labeling Act, and Chapter 367 of the 1965 Public Acts of Tennessee (See Appendix B), herein referred to as the Licensing Act, are violative of the Federal Constitution and therefore void. Injunctive relief also being sought to restrain state officials [2] from enforcing the statutes, a three-judge court was constituted pursuant to 28 U.S.C.A. §§ 2281 and 2284.

Specifically, the complaint alleges that the Acts violate (1) the Commerce Clause of the Constitution of the United States, Art. I, Sec. 8, in that they constitute an unreasonable burden and restriction upon foreign and interstate commerce, and an effort by the State of Tennessee to levy and collect duties upon foreign goods imported into the State of Tennessee; (2) the Fourteenth Amendment, in that they deprive the plaintiffs of their property without due process of law and deny to them the equal protection of the law; and (3) the Supremacy Clause of the Constitution, Art. 6, in that the Acts are in conflict with acts of Congress which have preempted the field by imposing various regulations and restrictions upon the importation of foreign meat. Since plaintiffs for procedural reasons have abandoned reliance upon the Supremacy Clause of the Federal Constitution, in the light of Swift & Company, Inc. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed. 2d 194 (Nov. 22, 1965), and an appropriate order has been entered to that effect, and since we conclude that the Acts must be declared void under the Commerce Clause, we consider in this opinion that provision of the Federal Constitution only, without reference to the Supremacy Clause or the Fourteenth Amendment.[3]

Both Acts challenged in this proceeding were enacted by the 84th General Assembly of Tennessee, the Labeling Act having been passed on February 16, 1965, and the Licensing Act on March 16, 1965. The Labeling Act requires that any person selling or offering for sale in the State of Tennessee any meats or meat foods which are the products of any foreign country to the United States "shall so identify each product and its foreign origin." If any product is offered for sale in bulk or portions whereby labeling is not feasible, it is provided that "a conspicuous sign in lieu of the label shall be displayed near the stock or

---

1. At the hearing on the merits on January 10, 1966, the plaintiffs moved to dismiss the William Davies Company, Inc., as a party plaintiff, and this motion having been sustained and an appropriate order entered, we refer hereafter in this opinion only to the Tupman Thurlow Company, Inc., as party plaintiff.

2. In addition to the defendants named in the original complaint, the Tennessee Livestock Association and the Tennessee Farm Bureau Federation, Inc., were permitted to intervene as defendants. They have participated in the proceedings in support of the validity of the Tennessee Acts.

3. Jurisdiction is properly invoked under 28 U.S.C.A. § 1331; and 28 U.S.C.A. §§ 2201 and 2202 confer authority to render a declaratory judgment.

display of the product." If foreign meats are combined with domestically produced meat into one product, the product shall be so labeled. In the event preservatives of any kind are used in any packaged meat product, the preservative shall be identified, along with the quantity used, and clearly displayed on any such package. It is provided that all bids submitted on meat and meat products to any tax-supported institution within the state shall contain one of the following labels: "This meat is of foreign origin," or "this meat is domestic meat," or "[t]his is a combination of foreign and domestic meats," the institution being authorized to reject any such bid.

Responsibility for the administration of the Act is vested in the State Commissioner of Agriculture, who is empowered to promulgate regulations to effectuate its provisions. It is provided, however, that "none of said regulations shall require a higher standard of purity and sanitation than is from time to time required by the regulations of the United States Department of Agriculture to govern meat inspection by its agricultural research service." Violations of the Act are made misdemeanors punishable by prescribed fines and jail sentences, which are increased in severity for second and successive offenses.

The Licensing Act requires the registration and the annual licensing of "each person, firm or corporation in the State of Tennessee engaged in the business of manufacturing, buying, selling, handling, processing, packing or distributing imported meat or imported meat products, either at retail or wholesale." Imported meat and imported meat products are defined as "meats whose source of origin was beyond the continental limits of the United States and are or will be sold to the ultimate consumer as fresh or raw meat." The Act provides for two classes of licensees: (1) Manufacturers, packers or processors who are required to pay an annual license fee of $1500; and (2) Wholesale dealers or distributors who are required to pay an annual license fee of $500.

Each place of business must be separately registered and licensed. The supervision of the registration and licensing required by the Act are vested in the Foods Division of the Department of Agriculture, whose Commissioner is empowered and directed, when it can be shown that there is a shortage of any native meats, to "authorize the use, sale or otherwise handling of imported meats and meat products by all those required to be licensed by this Act without the payment of the fees required herein." Such authorization shall not exceed ninety days from the time that it is shown that the shortage no longer exists. All registration and license fees are appropriated to the Department of Agriculture, "to be used separately in carrying out the provisions of this Act and none of the funds or fees collected under this Act can be paid to or used for or by any other governmental agency." Any violation of the Act is declared to be a misdemeanor with a fine of not less than $25.00 nor more than $50.00 for each offense, each day on which a violation occurs constituting a separate offense.

Before discussing the substantive issues as to the constitutionality of the Acts when measured in terms of the Commerce Clause, we consider first the contentions of the defendants that the plaintiff is without standing to challenge the validity of the Acts, and that this Court should abstain from passing upon the issues until a state court has first had the opportunity to construe the Acts and to adjudicate their validity.

The predicate for the defendants' argument that the plaintiff is without standing to challenge the Labeling and Licensing Acts is the fact that the Acts are not directly operative in their requirements against the plaintiff and neither restrain nor require any act on its part, since plaintiff itself handles no meat and has no place of business in Tennessee. It is insisted that plaintiff is in no position to assert the rights of others, such as plaintiff's Tennessee customers upon whom the Acts' exactions and burdens directly fall. This objection

would be of substance and would require dismissal of the action if the plaintiff suffered no injury or damage from the enforcement of the Acts, or if any injury or damage suffered by the plaintiff, should be indirect or remote and not direct and immediate. But such is not the case alleged in the complaint, nor, as a brief résumé of the pertinent facts will demonstrate, is it the case established by the proof.

Plaintiff is a New York corporation with no office or place of business in Tennessee. For several years it has been engaged in foreign and interstate commerce as a dealer in imported meats. It purchases meat which is grown, slaughtered and packaged in foreign countries, imports such meat into the United States, and resells it within and among the several states of the United States, including Tennessee. Its business is exclusively in interstate or foreign commerce. Its practice is to solicit orders from customers in Tennessee and then to have the meat imported into the United States in sealed cartons, each of approximately sixty pounds in weight, under conditions of refrigeration which cause the meat to remain hard frozen, and to be delivered in that form to its customers in Tennessee. In addition, plaintiff sells its meat to out-of-state manufacturers and processors having a national distribution. Such imported meat is used by the manufacturers in the processing and manufacturing of canned meats, soups, baby food, frozen food dinners, bologna, hamburgers, frankfurters, and the like. Such products are sold through retail outlets and stores in Tennessee. Wholesale distributors in Tennessee also receive imported meat from the plaintiff which is resold to persons in the State of Tennessee and then manufactured or processed into meat products which are then sold to the public through various retail outlets in Tennessee.

The allegations of the complaint, amply sustained by the evidence, are to the effect that the passage of the Labeling and Licensing Acts by the General Assembly of Tennessee has caused plaintiff's Tennessee customers to refuse to purchase its imported meat, thus for all practical purposes destroying the Tennessee market for its direct sales. Tennessee customers, in refusing to continue their business relationships with plaintiff, have stated as the basis for their refusal to purchase, the burdensome requirements imposed by the Tennessee Acts here in question. The direct and immediate impact of the legislation is graphically shown by the plaintiff's Tennessee sales figures for 1964 and 1965. In 1964, 1,619,991 pounds of imported meat, for a total sales volume of $602,593.45, were sold to Tennessee customers. In contrast, for the year 1965, 549,013 pounds were sold, for a total sales volume of $214,259.73. It is shown that plaintiff's sales to Tennessee customers terminated in July 1965, the effective date of the Acts, with some minor exceptions which are irrelevant to the present inquiry.

After the issuance of a preliminary injunction to restrain the enforcement of the Acts, some Tennessee sales were renewed, but the volume of such sales is not shown in the evidence. The evidence further justifies the conclusion that the fees imposed by the Licensing Act serve to place the plaintiff's meats in a disadvantageous competitive position and directly contribute to their exclusion from the Tennessee market. Under such circumstances, although the plaintiff is not directly within the terms of the Acts, it nevertheless is so directly and immediately affected by their operation that it has standing to challenge their validity upon the ground that they constitute an undue burden upon interstate commerce. We are of the opinion that this conclusion is supported, by strong analogy if not directly, by the Supreme Court's rulings in Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); and Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182 (1912).

The defendants' abstention argument is also without substance. It is

true that in some respects the statutes under consideration are not entirely free from uncertainty or ambiguity as to their meaning and application. Nevertheless, even construing these statutes in the light most favorable to defendants, they still present problems of constitutional dimensions. No reasonable construction which state courts could place upon the legislation would remove the constitutional infirmity. The abstention doctrine does not require a federal court to withhold the enforcement of a right guaranteed by the Federal Constitution merely for purposes of delay. On the facts of the present case, therefore, the doctrine of abstention is without application, whatever vitality it may still possess in other contexts. Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); and City of Chicago v. Atchison, Topeka & Santa Fe Railway Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

■ Turning to the substantive issues, we find no escape from the conclusion that the Labeling and Licensing Acts, whether considered separately or essentially as one regulatory measure, impose unreasonable and discriminatory restrictions and burdens upon interstate and foreign commerce, and so run afoul of the Commerce Clause. The line of demarcation between a permissible and impermissible state regulation affecting interstate commerce has been charted in manifold decisions of the Supreme Court from the earliest days of our Republic to the present time. While the Commerce Clause as construed by the Supreme Court does not prohibit all state regulatory measures affecting interstate commerce, the Supreme Court has invariably outlawed those state restrictions which unduly and unreasonably burden or restrain interstate commerce when evaluated in terms of legitimate state or local interests, or those state restrictions and regulations which unreasonably discriminate against such commerce. Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964); Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); Voight v. Wright, 141 U.S. 62, 11 S.Ct. 855, 35 L.Ed. 638 (1891); State of Minnesota v. Barber, 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455 (1890); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824).

The burdensome and discriminatory character of the present legislation can scarcely admit of doubt when it is considered in the light of the pertinent facts. In sweeping terms the Labeling Act requires that "each quarter of each carcass, each carton, each retail package, or individually packaged item shall be plainly identified with a brand or label stating that it is a foreign product and naming the country of its origin." Direct responsibility for such labeling is imposed upon "any person, firm, or corporation who sells or offers for sale in the State of Tennessee, through packing houses, meat markets, stores, or otherwise, any meat, meat-foods, either fresh, canned, frozen, or cured, which are products of any foreign country to the United States * * *." The evidence discloses that manufacturers and processors of meatfoods and products, such as weiners, bologna, hamburgers, baby foods, and other products, customarily, use foreign and domestic meats indiscriminately without any effort to keep the one separate from the other. The Labeling Act would require such products to be labeled to show the fact of co-mingling and the country in which the foreign meat had its origin. It would be necessary for Tennessee handlers of plaintiff's meat or meat products to keep track of or trace the origin of such meat, purchased either directly or through wholesalers or manufacturers, in order that the ultimate product sold to consumers in the State of Tennessee could be identified and labeled with the country of origin, or labeled in such way as to indicate that foreign and domestic meats both had been used. That these requirements of labeling are exceedingly burdensome is self-evident. Indeed, it is reasonable to infer that in co-mingling domestic and foreign meats, compliance with the Act would be a prac-

tical impossibility. Yet these onerous burdens apply under the Act only to foreign meat and to products in which foreign meat is used as an ingredient. Meats produced anywhere within the United States are exempt, with the result that the discriminatory burden on interstate and foreign commerce is unmistakably clear. It can hardly be argued that the burdens of the labeling requirements are materially alleviated by the provision that a conspicuous sign may be used in lieu of the label if any product is offered for sale "in bulk or portions whereby labeling is not feasible," for this provision would not in any way obviate the burden of tracing or determining the origin of meats or of meats used in various meat products, a consequence of the Act which is probably more objectionable than the actual labeling itself.

If we understand the defendants' position, it is not seriously contended that the Licensing Act, considered apart from the Labeling Act, can be sustained as a valid measure under the Commerce Clause. The defendants' theory is that "reading both the Labeling and Licensing statutes together necessitates the conclusion that the purpose of the legislation was to impose a license fee in order to defray the costs of supervising enforcement of these statutes."

Should the Acts be read in pari materia? It is true that there are arguments why this question should be answered in the negative. First, the two Acts, as already indicated, are not coextensive, in that the Licensing Act is restricted to foreign meat to be sold to the ultimate consumer as fresh or raw meat. The Labeling Act is not so limited.[4] If the purpose of the Licensing Act was to provide funds to supervise the cost of enforcing the Labeling Act, it is arguable that the incidence of the two Acts would have been the same. Second, the Licensing Act contains no provision referring or relating to the Labeling Act or its requirements. Third, Section 4 of the Licensing Act expressly provides that all funds derived from license fees are "to be used separately in carrying out the provisions of this Act. * * *" If the Licensing Act should be tested on its own merits without reference to the Labeling Act, it is exposed as an arbitrarily excessive and discriminatory burden and embargo on interstate and foreign commerce. It is not even suggested that the State Treasury would require the substantial fees imposed by this Act to do nothing more than supervise compliance with the limited provisions of the Licensing Act. In addition to the excessiveness of the prescribed fees, no reason appears nor has been assigned for imposing such a burden upon handlers of foreign meat to be sold to the ultimate consumer as fresh or raw meat, while not imposing the same burden upon handlers of domestic meat to be sold to the ultimate consumer in the same form. Such an arbitrary imposition, having the effect of impeding interstate and foreign commerce, is clearly proscribed by the Commerce Clause. Nippert v. City of Richmond, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946). That the Act has an exclusionary purpose is further evidenced by the provision authorizing the Commissioner of Agriculture to excuse the fees altogether "when it can be shown there is a shortage of any native meats."

It seems clear, however, under the Tennessee rule, since the two Acts were passed at the same session of the General Assembly and deal with the same

---

4. Since retailers are not included by name in Section 3 of the Licensing Act defining the classes of licensees, it could be argued that they are not required to pay the annual license fee, a view apparently adopted by the State Commissioner of Agriculture. Under this construction the Act would be even less comprehensive than indicated above. However, in view of the specific reference to retailers in Section 1, a reasonable construction would appear to be that they are embraced within the term "distributor" in clause 2 of Section 3, and might well we included as "manufacturers" or "packers" in clause 1 of such Section, if they prepared their own hamburger packages, as the testimony showed was the practice of some retailers. This issue of statutory construction need not be resolved for purposes of the present inquiry.

subject matter, that they should be read together as one regulatory scheme. Gates et al. v. Long et al., 172 Tenn. 471, 481, 113 S.W.2d 388 (1937); State v. Allman, 167 Tenn. 240, 243, 68 S.W.2d 478 (1934). On this basis, assuming that the major purpose of the Licensing Act is to raise funds to supervise enforcement of the Labeling Act, which we hold to be invalid, it would appear that the two Acts would necessarily be required to share the same fate. Furthermore, as so read and construed, the discriminatory character of the statutory exactions in the Licensing Act would still remain, in that there would be no logical or reasonable basis for imposing the substantial burdens of the Act upon handlers of foreign meats while exempting those who handle domestic meats.

Defendants undertake to support the present legislation solely upon the ground that it constitutes a proper exercise of the state's police power to protect the consumer from fraud and deception.[5] It is insisted that for almost a century states have been enacting legislation pursuant to their police power, with the approval of the Supreme Court, to protect citizens from being deceived or misled in their purchase of commodities, especially foods and food products, at retail.

In seeking to answer the question how consumers in Tennessee are misled by the sale of meat in that state which was originally imported, defendants point to the fact that the plaintiff's imported meat is frozen in the country of origin and then imported and sold in its frozen form to citizens in Tennessee and other states. They point to the further fact that most of such imported meat is then processed and sold in the form of frankfurters, bologna, hamburgers, soups, canned foods, baby foods and the like. From these premises the defendants argue, without any factual support in the record, that when a Tennessee consumer purchases such meat, which is of course no longer a frozen product,

"he obviously thinks he is buying a fresh product. This is clearly deception regardless of the intent of the seller or the quality of the meat sold. It is not the product, but deception in its sale, which the Tennessee Legislature sought to bar by requiring that country of origin be indicated so that the consumer may know the exact nature of the meat product he purchases."

In support of this thesis, defendants refer to surveys indicating that consumers prefer fresh over frozen meats, and that the moisture from thawing meat carries away minerals and other nutrients and that re-freezing, commonly done by the unsuspecting consumer, may make the meat less tender and juicy.

The argument is met with a number of insuperable difficulties. There is no evidence that food products, such as those referred to by the defendants, are supposed by a consumer to be a fresh product, in the sense that the meat content has never been frozen, although we may suppose that this could be true as to hamburger meat. Nor is there any evi-

---

5. Since the Labeling Act expressly provides that the Commissioner of Agriculture, in implementing the Act, shall issue no regulation requiring a higher standard of purity and sanitation than is required to govern the federal inspection of foreign meat, no serious contention can be made that the labeling requirement was designed as a valid health measure under the police power of the state. There is no proof that foreign meat, per se, is unwholesome or impure, or that it poses a health problem. Plaintiff's foreign meats are imported and sold in sealed cartons, labeled with country of origin, and inspected by federal inspectors at port of entry, in accordance with federal laws and regulations which impose standards of wholesomeness and purity. Such foreign meats are deemed and treated as domestic meat within the provisions of 34 Stat. 674. The requirement in the Labeling Act for disclosure of any preservatives used in a packaged product could have been designed as a health regulation, but the difficulty is that its burden falls on foreign meat only with no like requirement as to domestic meat. Such a distinction is purely arbitrary, further emphasizing the discrimination against interstate and foreign commerce.

dence that such products are generally offered for sale or represented to the public as fresh products. But whether these assumptions by the defendants are correct or not, it is difficult to see how the Labeling Act could have been designed to protect the consumer from deception, when the same protection is not afforded him in purchasing the same products which have been manufactured from frozen domestic meat. If the consumer is entitled to be advised, albeit indirectly, that he is purchasing foreign meats which have been frozen, he is entitled to receive the same information about domestic meats which have been frozen.

The authorities relied upon by the defendants to support their theory that the Labeling Act should be upheld as a reasonable regulation to prevent fraud and deception in sales of food products may be readily distinguished. In Plumley v. Com. of Massachusetts, 155 U.S. 461, 15 S.Ct. 154, 39 L.Ed. 223 (1894), the Supreme Court upheld a Massachusetts statute which prohibited the sale of oleomargarine which had been artificially colored to look like yellow butter, a statute which differs from the Labeling Act now under consideration in two important aspects. First, it directly prohibited the sale of a product whose appearance *per se* was deceptive. Second, the prohibition of the Massachusetts statute applied to all artificially colored oleomargarine, whether domestic or foreign. It is significant that the Court in *Plumley,* before ruling upon the Massachusetts statute, cited four cases, Brimmer v. Rebman, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862 (1891); State of Minnesota v. Barber, 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455 (1890); Walling v. People of State of Michigan, 116 U.S. 446, 6 S.Ct. 454, 29 L.Ed. 691 (1886); and Hannibal & St. J. R. Co. Railroad Co. v. Husen, 95 U.S. 465, 24 L.Ed. 527 (1877) in each of which a state statute which imposed burdens on wholesome products of other states which were not imposed upon similar products of the home state was invalidated under the Commerce Clause. The *Plumley* ruling simply was that the state's police power does authorize and permit the regulation of commerce in unwholesome food products, or in products whose appearance deceives or misleads the public, provided that the prohibition or regulation does not discriminate in favor of local products. As stated by the Court:

> "If the statute of Massachusetts had been so framed as to be applicable only to oleomargarine manufactured in other states, and which had been made in imitation of pure butter, the case would have been wholly different. But we have seen that it is not of that character, but is aimed at all oleomargarine artificially colored so as to cause it to look like genuine butter, and offered for sale in Massachusetts."

Similarly, Crossman v. Lurman, 192 U.S. 189, 24 S.Ct. 234, 48 L.Ed. 401 (1904), (sustaining the validity of a state statute prohibiting the sale of adulterated foods, whether domestic or foreign), Hutchinson Ice Cream Co. v. State of Iowa, 242 U.S. 153, 37 S.Ct. 28, 61 L.Ed. 217 (1916), (upholding a state statute challenged on equal protection grounds under the Fourteenth Amendment which prohibited the sale as ice cream of compounds which did not contain a minimum percentage of butterfat), and Hebe Co. v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255 (1919), (upholding an Ohio statute prohibiting the sale of condensed milk which was condensed not from whole milk but from skim milk, and made applicable to condensed skim milk which was produced both within the state and without), are inapposite and not controlling for, unlike the present Labeling Act, they involved non-discriminatory regulations reasonably designed to protect the public from deception and fraud. The regulation here involved cannot fairly be construed as a consumer-protection measure, and if it should be, it would be interdicted by the Commerce Clause because it unreasonably discriminates against foreign products in favor of products of domestic origin. For similar reasons, defendants' reliance upon cases upholding

various state labeling requirements, such as Double-Eagle Lubricants, Inc. v. State of Texas, D.C., 248 F.Supp. 515 (Dec. 10, 1965) ; Swift & Company, Inc. v. Wickham, supra; National Fertilizer Association, Inc., v. Bradley, 301 U.S. 178, 57 S.Ct. 748, 81 L.Ed. 990 (1937) ; Armour & Co. v. State of North Dakota, 240 U.S. 510, 36 S.Ct. 440, 60 L.Ed. 771 (1916); Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182 (1912), and Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171 U.S. 345, 18 S.Ct. 862, 43 L.Ed. 191 (1898) ; is misplaced, since the regulation in each of these cases was fairly designed to convey pertinent information to the public as to the nature, quality or quantity of the product purchased, and was made applicable to all products of a similar kind regardless of their origin, whether within or without the state. The present labeling requirement, in contrast, would do nothing except inform the public that a meat product had its origin in a foreign country without conveying any information as to its nature, quality or quantity. In addition, as noted, it imposes substantial burdens upon meat and meat products of foreign origin without imposing the same burdens upon meat and meat products of domestic origin.

It is further insisted by the defendants that the present legislation does not offend the Commerce Clause because it operates only on goods which have come to rest in Tennessee so as to become part of the common property of the state, citing such typical cases as Gulf Fisheries Co. v. MacInerney, 276 U.S. 124, 48 S.Ct. 227, 72 L.Ed. 495 (1928) ; Texas Co. v. Brown, 258 U.S. 466, 42 S.Ct. 375, 66 L.Ed. 721 (1922) ; and Pabst Brewing Co. v. Crenshaw, 198 U.S. 17, 25 S.Ct. 552, 49 L.Ed. 925 (1904). The cases cited by the defendants involving the "come to rest" and original package doctrines, merely recognize, because of the nexus with the state thus established, the power of the state to impose taxes or regulations upon those foreign goods which are designed to compete in the domestic market. Conceding that the imported meats in the present case are designed to compete in the domestic market, and that the state therefore has the power to regulate, it remains evident that the state may do so only if the regulations apply equally to foreign and domestic meats, and thus make possible equal competition in the domestic market.

Defendants refer to Sec. 3 of the Labeling Act and suggest that it can be saved by the application of the severability clause, since it contains no arbitrary or discriminatory feature, and since it deals with purchases by the state in its proprietary capacity. This Section provides that bids submitted in Tennessee to tax-supported institutions shall be labeled to indicate whether the meat or meat products are of foreign origin, of domestic origin, or a combination of foreign and domestic meats, such institutions being authorized to reject any bids. While it is arguable that the Section is non-discriminatory, when considered apart from other portions of the Act, it is clear that it is capable of being applied administratively to discriminate against imported meats. Even conceding that the Section is not discriminatory, some doubt as to its constitutionality would still remain in view of the burden it would impose on interstate and foreign commerce with no clearly-defined police power purpose. But whether this Section standing alone could survive a test of constitutionality, we need not decide, for we conclude that it cannot be saved by application of the severability clause. As we have found, the dominant purpose of the legislative scheme was to protect the local meat producer from competition with imported products by imposing restrictions and burdens of such character and effect as to exclude such products from the markets of Tennessee.

It is well-settled that a severability clause is merely an aid to construction, not an inexorable command. Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 361, 362, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) ; Dorchy v. State of Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed.

686 (1924). It should not be applied "so as to defeat what appears to be the paramount legislative intent." Arthur v. State, 148 Tenn. 434, 437, 256 S.W. 437, 438 (1923). "It is to be given a reasonable interpretation and does not operate to save provisions which clearly would not have been inserted except upon the supposition that the entire act was valid." 16 Am.Jur.2d, Sec. 187, p. 419. So in this case, absent the restrictions and burdens on imported meats which it was the paramount purpose of the remainder of the legislation to impose in order to exclude them from the Tennessee market, it is our opinion that Section 3, at least in its present form, would not have been enacted.

In accordance with this opinion a form of judgment will be submitted declaring the Labeling Act and the Licensing Act to be in conflict with the Commerce Clause and therefore void, and permanently enjoining the State Commissioner of Agriculture and the State Chemist and Director of Foods Division, Department of Agriculture, from enforcing the provisions of such Acts.

## APPENDIX A

### Chapter No. 34
### 1965 Public Acts of Tennessee

An Act requiring proper identification of imported meats when offered for sale in this state and requiring identification on bids of meat products to state institutions and providing penalties for violations thereof.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That any person, firm, or corporation who sells or offers for sale in the State of Tennessee, through packing houses, meat markets, stores, or otherwise, any meats, meat-foods, either fresh, canned, frozen or cured, which are products of any foreign country to the United States, shall so identify each product and its foreign origin.

Section 2. *Be it further enacted,* That each quarter of each carcass, each carton, each retail package, or individually packaged item shall be plainly identified with a brand or label stating that it is a foreign product and naming the country of its origin. If any product be offered for sale in bulk or portions whereby labeling is not feasible, then a conspicuous sign in lieu of the label shall be displayed near the stock or display of the product. When foreign meats are combined with domestically produced meats into one (1) product, it shall be so labeled. In addition, should preservatives of any kind be used in any packaged meat product, the preservative shall be identified, along with the quantity used, and clearly displayed on any such packaged.

Section 3. *Be it further enacted,* That all bids submitted on meat and meat products to any tax-supported institution within this State shall contain the following language: "This meat is of foreign origin," or "This is domestic meat," or "This is a combination of foreign and domestic meats." And said institution is hereby authorized to reject said bid.

Section 4. *Be it further enacted,* That the State Commissioner of Agriculture is responsible for the administration of this Act. In the performance of his duties thereof the Commissioner is authorized, empowered and directed to make and promulgate regulations to effectuate the provisions of this Act, but none of said regulations shall require a higher standard of purity and sanitation than is from time to time required by the regulations of the United States Department of Agriculture to govern meat inspection by its agricultural research service.

Section 5. *Be it further enacted,* That this Act and any portion hereof shall not be construed as to be in conflict with Chapter 9 of Title 52 of the Tennessee Code Annotated, but rather as supplementary thereto.

Section 6. *Be it further enacted,* That any person, firm or corporation

who shall fail to comply with the provisions of this Act and any portion thereof, shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than Twenty-five Dollars ($25.00) nor more than One Hundred Dollars ($100.00), or be imprisoned in the county jail not more than thirty (30) days for the first offense. For each second or successive conviction of such offense against the provisions of this Act, the fine shall be not less than One Hundred Dollars ($100.00) nor more than Five Hundred Dollars ($500.00) nor more than ninety (90) days imprisonment in the county jail, or both such fine and imprisonment.

Section 7. *Be it further enacted,* That the provisions of this Act are hereby declared to be severable, and if any of its sections, provisions, clauses, or parts be held unconstitutional or void, then the remainder of this Act shall continue in full force and effect, it being the legislative intent now hereby declared, that this Act would have been adopted even if such unconstitutional or void matter had not been included therein.

Section 8. *Be it further enacted,* That this Act shall take effect from and after July 1, 1965, the public welfare requiring it.

Passed: February 16, 1965.
    Jared Maddux,
      Speaker of the Senate,
    William L. Barry,
      Speaker of the House
         of Representatives.
Approved: February 24, 1965.
    Frank G. Clement,
      Governor.

## APPENDIX B

### Chapter No. 367
### 1965 Public Acts of Tennessee

An Act to authorize, require and levy an annual registration or license fee on all persons, firms or corporations engaged in the buying, selling, manufacturing, processing, packing, or distributing imported meat and imported meat products in the State of Tennessee; to define and fix the amount of such license fee; to define the word "imported meat and meat products"; to provide for the administration and enforcement of this Act; to provide the penalty for its violation.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That each person, firm or corporation in the State of Tennessee engaged in the business of manufacturing, buying, selling, handling, processing, packing or distributing imported meat or imported meat products, either at retail or wholesale, shall be required to register and obtain an annual license to be issued by the Foods Division of the Tennessee Department of Agriculture. The license shall be issued annually, and the license year shall be for twelve months beginning on July 1 and ending June 30.

Section 2. *Be it further enacted,* That imported meat and imported meat products shall mean only meats whose source of origin was beyond the continental limits of the United States that are or will be sold to the ultimate consumer as fresh or raw meat.

Section 3. *Be it further enacted,* That for the purpose of carrying out the provisions of the registration and the annual license fee the particular type or kind of license fees are classified as follows:

1. Manufacturers, packers, or processors shall register and pay an annual license fee of fifteen hundred dollars ($1,500.00).

2. Each wholesale dealer or distributor shall register and pay an annual license fee of five hundred dollars ($500.00).

Provided further, each place of business shall be separately registered and have a separate license and the license must be displayed in a conspicuous place in each place of business. No license shall be transferable, but a license may be moved from one place or location to another upon written consent and approval of the Commissioner of Agriculture.

Section 4. *Be it further enacted,* That the registration and license herein authorized shall be under the supervision and jurisdiction of the Foods Division of the Department of Agriculture.

Provided however, that the Commissioner is hereby empowered and shall, when it can be shown there is a shortage of any native meats, authorize the use, sale or otherwise handling of imported meat products by all those required to be licensed by this Act without the payment of the fees required herein. But such authorization shall not exceed 90 days from the time that it is shown that the shortage no longer exists.

That all registration and license fees collected under this Act shall be paid into the Treasury of the State, but all such funds are hereby exclusively appropriated to the Department of Agriculture; to be used separately in carrying out the provisions of this Act and none of the funds or fees collected under this Act can be paid to or used for or by any other governmental agency.

Section 5. *Be it further enacted,* That any person, firm or corporation who violates the provisions of this Act or who fails to comply with the provisions of this Act, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than twenty-five dollars ($25.00) nor more than fifty dollars ($50.00) for each offense. Each day on which a violation occurs shall constitute a separate offense.

Section 6. *Be it further enacted,* That this Act shall take effect from and after July 1, 1965, the public welfare requiring it.

Passed: March 16, 1965.
.     William L. Barry,
          Speaker of the House
                  of Representatives
     Jared Maddux,
          Speaker of the Senate.

Approved: Became a law without Governor Clement's signature.