**ARMOUR AND COMPANY, Plaintiff,**

**v.**

**STATE OF NEBRASKA, the Department of Agriculture and Economic Development of the State of Nebraska, Pearle Finigan, Director of the Department of Agriculture and Economic Development of the State of Nebraska, Russell Hoppner, Chief, Bureau of Dairies, Foods and Drugs of the Department of Agriculture and Economic Development of the State of Nebraska, and Frank B. Svohoda, County Attorney of Keith County, Nebraska, Defendants.**

**Civ. No. 1076L.**

United States District Court
D. Nebraska.

May 17, 1967.

Bert L. Overcash, of Woods, Aitken & Aitken, Lincoln, Neb., for plaintiff.

Clarence A. H. Meyer, Atty. Gen., Melvin K. Kammerlohr, Asst. Atty., Gen., Lincoln, Neb., for defendants.

Before JOHNSEN, Senior Circuit Judge, and ROBINSON and VAN PELT, District Judges.

## MEMORANDUM OPINION

PER CURIAM.

Armour and Company seeks declaratory and injunctive relief as to Legislative Bill 169 enacted by the Seventy-fifth Session of the Nebraska Legislature (Session Laws 1965, p. 73) against the officials and the agency of the State charged with its enforcement.[1] Federal unconstitutionality of the statute is claimed on its labeling requirements for the sale within Nebraska of imported meat and products containing such meat.

The case has been submitted to us on an agreed statement of facts. This stipulation shows that Armour is an importer of meat from other countries, brought into the United States in closed cartons, hard-frozen; utilized by it, in combination with domestic meat, for the production of "frankfurters, bologna, hamburger, and other such products"; and sold by it in such product forms within the State of Nebraska to retail outlets and retail stores.[2]

As to these sales, Section 2 of LB 169 requires that the product must be labeled "stating that it * * * contains imported meat, naming the country of its origin, in letters not less than one quarter of an inch in height, and date of exportation, regardless of the place of packaging * * * and date of pack-

aging if sterile-packaged outside the boundaries of the United States".[3]

Foreign meat, of course, is by law not permitted entry into the United States except under federal inspection. The parties' statement here agrees that all of plaintiff's imported meat is duly inspected and passed under the applicable provisions of federal law, "including the Federal Meat Inspection Act, Regulations by the United States Department of Agriculture, and Regulations of the Food and Drug Administration".[4] No question is involved as to this imported meat or the products into which it is incorporated not being healthful, wholesome, or fit for human consumption.

It is further stipulated that, for plaintiff to be able to comply with the labeling requirements of LB 169, "it would be necessary to keep track of the meat and meat products * * * sold * * * through its various plants, facilities, and products into the ultimate product which is offered for sale to consumers in the State of Nebraska and into the store shelves or refrigerators in such manner as to insure that the portions of imported meats incorporated in said products were identified as to countries of origin".

Beyond this, it is entitled to be noted that the language of the statute, previously quoted, also requires a labeling, and hence necessarily a keeping account, of the date of exportation in relation to all such meat and its product forms. Thus, where it may be necessary or is desired to use more than one importation lot or parts of different lots in some batch of a particular product, each country and each exportation date involved would have to be indicated on the label of the product for purposes of sale in Nebraska.

---

1. The County Attorney of Keith County has also been made a defendant because of a prosecution instituted by him against Armour for violation of the Act.

2. No question exists under the agreed statement as to the necessary jurisdic-

tional amount under 28 U.S.C.A. § 1331 being involved.

3. The full text of LB 169 appears in the appendix to this opinion.

4. See 19 U.S.C.A. § 1306(b); 21 U.S.C.A. §§ 71–91; 9 C.F.R. §§ 27.1–27.21.

LB 169 is one of a series of state labeling statutes enacted during the last few years in relation to the sale of imported meat.[5] Constitutional challenge has heretofore been made against three of these statutes, and each of them has been declared by a federal three-judge district court (28 U.S.C.A. §§ 2281 and 2284) to be violative of the Commerce Clause, Art. I, Sec. 8 of the Constitution of the United States. Tupman Thurlow Co. v. Moss, 252 F.Supp. 641 (D.C.M.D.Tenn.1966); Ness Produce Co. v. Short, 263 F.Supp. 586, (D.C.Or. 1966); International Packers, Limited v. Hughes, 271 F.Supp. 430 (D.C.S.D.Ia. 1967). The decision involving the Oregon statute was appealed to and was affirmed by the Supreme Court, per curiam, in Short v. Ness Produce Co., 385 U.S. 537, 87 S.Ct. 742, 17 L.Ed.2d 591 (1967).

The Tennessee statute involved in the *Tupman Thurlow* case required indentification of any imported meat sold, as "a foreign product and naming the country of its origin", and further provided that "When foreign meats are combined with domestically produced meats into one (1) product, it shall be so labeled". The three-judge court stated among other things in its opinion (263 F.Supp. at 645-646):

"The evidence discloses that manufacturers and processors of meat-foods and products, such as weiners, bologna, hamburgers, baby foods, and other products, customarily, use foreign and domestic meats indiscriminately without any effort to keep the one separate from the other. The Labeling Act would require such products to be labeled to show the fact of co-mingling and the country in which the foreign meat had its origin. It would be necessary * * * to keep track of or trace the origin of such meat * * * in order that the ultimate product sold to consumers in the State of Tennessee could be identified and labeled with the country of origin, or labeled in such way as to indicate that foreign and domestic meats both had been used. That these requirements of labeling are exceedingly burdensome is self-evident. Indeed, it is reasonable to infer that in co-mingling domestic and foreign meats, compliance with the Act would be a practical impossibility. Yet these onerous burdens apply under the Act only to foreign meat and to products in which foreign meat is used as an ingredient. Meats produced anywhere within the United States are exempt, with the result that the discriminatory burden on interstate and foreign commerce is unmistakably clear".

The Oregon statute involved in the *Ness Produce* case required that meat from a foreign country, in order to be sold within the State, had to be "labeled or branded to indicate the country of origin", and that accurate records had to be kept for a year of all such sales. According to the opinion, the imported meat was "chiefly used in conjunction with table beef trimmings to make hamburger and sausage products". The court pointed out that the label and record-keeping burdens imposed by the statute "do not relate to the quality of the product, but only to its place of origin", and that "The substantial costs of labeling and record-keeping which the Act imposes on sellers of imported meat have an obvious and direct impact on interstate commerce". 263 F.Supp. at 588. With the statute declared to be "designed primarily to provide economic protection to Oregon cattlemen" and to operate "primarily, if not exclusively, to burden and make difficult the sale of imported meat", the court held that there was involved no such legitimate police-power interest as could entitle the state to inflict this substantial burden and consequence upon interstate commerce. As noted, supra, the judgment

---

5. The opinion in Ness Produce Co. v. Short, 263 F.Supp. 586, 588 (D.C.Or. 1966) states that 17 such statutes were enacted in a three-year period, "principally in beef-producing states."

in the case was summarily affirmed by the Supreme Court.

The Iowa statute involved in the *International Packers* case forbade the sale in the State through food establishments of meat from foreign countries or meat products containing such meat, except upon display of a conspicuous sign indicating the meat to be imported and with label or brand upon it or the product containing it, "naming the country of its origin". The court declared that "Enforcement of this statutory provision would essentially eliminate the sale of imported meats in Iowa by the plaintiff"; that the problems inherent in tracing the imported meat used in blending with domestic meat for food-product purposes would cause processors and manufacturers to cease buying imported meats; that the extent of the burden thus imposed on commerce was not one which could be "justified in terms of Iowa's inherent power to protect the life, liberty, health and property of its citizens",[6] since the protection argued to be afforded Iowa consumers from deception was not as to the quality of the product but only as to the origin of the meat—and with this supposed concern being treated as not having basis in relation to any domestic meat, no matter from what far reaches of the United States it might come (for example, Puerto Rico). The opinion concluded: "This court can find no legitimate state interest justifying the burden imposed upon interstate commerce by the Iowa Labeling Act. The Iowa Act violates the commerce clause of the Constitution of the United States and is therefore void and unenforceable".

As appears from the portion of LB 169 which has been previously quoted herein, the Nebraska statute subjects the sale of imported meat to an even greater burden in labeling than that imposed by the statutes of the three States which have just been discussed. It requires the label upon a product in which any such meat is used not only to state that imported meat is contained therein and to name the country of its origin, but also to set out the date when the meat involved was exported.

A labeling requirement that imported meat be identified "as a foreign product and naming the country of its origin" —which the court held as to the Tennessee statute was "exceedingly burdensome" and constituted as to the commingling thereof into food products a "practical impossibility"—would have its onerousness materially increased by the further need under the Nebraska statute of keeping track of and carrying forward the exportation date of the meat, from the commencement of its foreign-commerce course, through its continuance into the commingling channel, and until the reaching of its marketing and distributional goal.

But even beyond this, such exportation-date labeling could hardly in fact represent anything but an artificial and discriminatory requirement in the situation. With admittedly no question being involved as to the condition of the meat, all that the exportation date could be contended to relevantly convey would be some indication of the extent of the meat's refrigeration and storage. If, however, extent of refrigeration and storage could represent a legitimate state interest in relation to commerce as a matter of consumer information, then the State could hardly any less have concern that the consumer also be provided with information making some corresponding indication as to domestic meat from other states or meat slaughtered within the state, which similarly was the subject of product use and as to which there similarly could be varying refrigeration and storage involved.

What the court said in the Oregon case was the manifest purpose of that statute —to strike at the importation of meat by burdening and making difficult its sale —is equally true and apparent as to the

6. See Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960).

Nebraska statute on its provisions as discussed above and from its legislative history.

The committee hearing and the floor discussions on the bill are permeated with blunt and unmistakable expression as to the legislative intent and object. Only a few of these will be set out in illustration. Thus, the primary sponsor of the bill opened the consideration of it on the floor with the statement that "The producers and feeders of our meat products have had a rough time by the importation of foreign meats". Another legislator characterized the bill as an attempt, "to the extent we can do it * * to protect the biggest industry of this state which is basic to our state". He added: "The purpose of this bill is obvious. It's discouraging use of imported beef from foreign countries and why? Because we want to protect the basic industry of this state. If it only accomplishes five percent of its purpose at least it's better than it is now and of course we want to create in the minds of the housewife who buys meat when she sees it's imported meat that she doesn't want to buy it * * *. This is the least we can do to give it to them [the cattle industry], and see if it'll work. If it don't work we're no worse off than we are now". Still another legislator urged, in wider horizon, that "this thing could catch on all over the country like a snowball would and I think it could do a lot of good and maybe even open up the eyes of the administration [in Washington] to show them how the people of this country feel of importing beef when we have more than enough here and that the cattlemen and the farmers are being hurt by it * * *".

■ While the desire of the Nebraska Legislature to serve the interest of the cattle industry of the State is both proper and commendable, it could not, of course, in its attempt to strike at imported meat resort to means which were designed or had the effect to unreasonably burden or prevent commerce in such meat, when weighed in relation to legitimate state police-power interest. A State cannot,

as said in the *Ness Produce* case, supra, 263 F.Supp. at 589 and the cases there cited, act wholly "to insulate its citizens from outside competition". Whatever insulative result it may achieve can only be incidental to some reasonable exercise of its police power in legitimate welfare protection.

Here, while the discussion on the legislative floor could leave no possible doubt as to what the real object of LB 169 was, some interjections of purported justification were made as to a housewife having the right to know the nature of the product she was buying. Assuming that there can be a legitimate state interest in having a purchaser informed by some reasonable indication of the fact that the products here involved contained in part imported meat, the difficulty with LB 169 is that it goes far beyond such means and burdens as would be necessary to provide this information for consumer choice.

What the labeling requirements were intended to accomplish was not merely to give the housewife information that she was buying in part imported meat and to allow her to make a choice on that simple basis, but, in the expression of one of the legislators quoted above, "to create in the minds of the housewife who buys meat when she sees it's imported meat that she doesn't want to buy it". The character of the labeling requirements,—in the emphasis from the size of the lettering prescribed (one-quarter inch); from the statement necessary to be made not only that the product contained imported meat but what the name of the country of its origin was; from the setting out of the date of exportation; and from the several repetitions which would have to be made of these facts on a label where more than one importation lot was used in a batch of the products—would seem to be clearly designed and to have the capacity to make a housewife feel that the product was something to be shunned, as a matter either of stimulated reaction against it from its labeling, or of uncertainty as to what might be the implications

thereof as to its food significance and purchase.

On the unreasonableness of the labeling requirements in such legitimate state interest of consumer information as might properly be attempted to be served, and on the undue burden imposed by the labeling requirements upon plaintiff's imported meats in the field of commerce, we hold that LB 169 is violative of the Commerce Clause and that its enforcement against the plaintiff is entitled to be enjoined.

A judgment will be entered in accordance with this opinion.[7]

## APPENDIX

(Session Laws 1965, p. 73)

### LEGISLATIVE BILL 169

AN ACT relating to meat; to require notice, as prescribed, when imported meat or meat products are sold or offered for sale; to provide penalties; to provide for enforcement; to provide for rules and regulations; and to provide powers and duties.

Be it enacted by the people of the State of Nebraska,

Section 1. As used in this act, unless the context otherwise requires, meat shall mean the dressed flesh of cattle, swine, sheep, or goats but shall not include fish of products of fish.

Sec. 2. (1) Except as provided in subsection (2) of this section, any person, persons, association, firm, or corporation, who knowingly sells or offers for sale any meat imported from without the boundaries of the United States, or any meat product containing imported meat, without labeling such meat or meat product, stating that it is imported or contains imported meat, naming the country of its origin, in letters not less than one quarter of an inch in height, and date of exportation regardless of the place of packaging including when packaged in the United States or the country of origin and date of packaging if sterile-packaged outside the boundaries of the United States, shall be guilty of a misdemeanor.

(2) Any operator of any restaurant, cafeteria, or other business establishment serving prepared foods for consumption on the premises who knowingly sells or offers for sale in such establishment any meat imported from without the boundaries of the United States, or any meat product containing imported meat without giving notice of such fact, either by statement thereof on the menu or by one or more signs conspicuously posted on the premises, shall be guilty of a misdemeanor, but it shall not be required that he name the country of origin of any such meat or meat products.

Sec. 3. It shall be the duty of the Bureau of Dairies and Food and the Weights and Measures Division of the Department of Agriculture and Economic Development to aid in the enforcement of the provisions of this act. The Director of the Department of Agriculture and Economic Development or his duly authorized agents shall have free access at all reasonable hours to every wholesale or retail establishment which sells or offers to sell meat to the public and may enter any packaging, canning, or processing establishment and any vehicle being used to transport any such meat for the purpose of securing samples or specimens of such meat or productss. The department shall be granted the right to audit invoices.

Sec. 4. The Director of the Department of Agriculture and Economic Development is hereby authorized to adopt such regulations as he may deem necessary to properly enforce the provisions of this act.

Sec. 5. It shall be the duty of a county attorney to whom the Director of the Department of Agriculture and Economic Development or his agent reports a

---

7. In view of the decision reached, similarly as in the three other state labeling cases, it is not necessary to give consideration to plaintiff's other contentions of un-constitutionality—violation of the Fourteenth Amendment and of the Supremacy clause.

violation of the provisions of this act to institute appropriate proceedings in the proper courts without delay and to prosecute the same in the manner provided by law.

Sec. 6. Any person violating the provisions of section 2 of this act shall be guilty of a misdemeanor and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, nor more than one thousand dollars, or by imprisonment in the county jail for not less than thirty days nor more than ninety days, or by both such a fine and imprisonment.

Approved May 26, 1965.