## AMERICAN MEAT INSTITUTE, Plaintiff,

v.

## Dale B. BALL, Replaced by Dean M. Pridgeon, Director of the Department of Agriculture of the State of Michigan and Edward C. Heffron, Chief of the Food Inspection Division of the Michigan Department of Agriculture, Defendants.

### No. G75–39.

United States District Court, W. D. Michigan, S. D.

Aug. 20, 1981.

Richard B. Foster, David Vander Haagen, Lansing, Mich., J. Stanley Stroud, Washington, D. C., for plaintiff.

Harry G. Iwasko, Jr., Robert Ianni, Asst. Atty. Gen., Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This case was originally before Judge Noel Fox who issued a partial summary judgment dismissing Count I of this Complaint that Section 4a of the Michigan Comminuted Meat Law, 1973 P.A. 143, M.C.L. § 289.584a; M.S.A. § 12.964(4.1) violated the Supremacy Clause. Plaintiff, representing seven meat producers, stated that Congress had preempted the entire marking and labeling field for federally inspected meat and meat food products when, in Section 408 of the Wholesome Meat Act, 21 U.S.C. § 678, it declared, in material part, that:

> ... Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements of subchapter I of this chapter ...

Although Michigan has imposed its ingredient standards since 1952, the Michigan Comminuted Meat Law did not become effective until 1974. This Michigan statute provides as follows:

> (1) A person shall not sell or offer for retail sale a product which is not manufactured to the ingredient standards of this act unless the federal government preempts Michigan's ingredient standards. In that case federally inspected meats not meeting the ingredient requirements of this act must be prominently identified in the display area where they are offered for sale.

> (2) The identification shall consist of a sign not less than 18 by 24 inches with the heading to read: 'The following products do not meet Michigan's high meat

ingredient standards but do meet lower federal standards,' printed in letters not less than 1½ inches high. The name of the manufacturer or distributor and the specific name of that product shall be carried on the sign in letters not less than ½ inch high. All letters and numerals in the sign shall be in red on a yellow background.

(3) When sold or offered for sale from a retail sales display, vending machine, or bulk container, the required placard shall be clearly visible to a customer.

(4) When sold or offered for sale in a food service establishment or other public eating place, the required information must be on a placard as described above, or printed on the menu in type and lettering similar to, and as prominent as, that normally used to designate the serving of other food items.

Plaintiff contends that, even if the language of this statute, as Judge Fox ruled, does not constitute labeling as defined by the Act, but is merely a notification requirement and an exercise of commercial speech protected by the First Amendment, it nonetheless violates the Commerce Clause of the Constitution, and imposes ingredient standards on meat and meat products traveling in interstate commerce in violation of the Wholesome Meat Act.[1]

Among other things, Plaintiff alleges that these sign posting requirements are discriminatory, in effect, in that they operate as intended: (1) to discriminate against federally inspected meat food products in favor of Michigan-produced products, thus unduly burdening interstate commerce as there is no extra cost for Michigan producers to conform to the Michigan statute, while there are increased costs to out of state producers who wish to sell products in Michigan; and (2) as there are virtually no retailers wishing to sell meat products which require posting of a placard, Michi-

gan has not provided consumers with information to exercise freedom of choice, but has succeeded in enforcing preempted ingredient standards. The United States, which has filed an *amicus curiae* brief in this action, contends that the Michigan requirement violates Congress' clearly manifested intent to preempt the field, and as the sign requirement only applies to out of state producers, it has an inherently discriminatory effect.

The major differences between the federal and Michigan ingredient requirements which have prompted enforcement actions by the Michigan Department of Agriculture under Section 4a are that: (1) the Federal Meat Inspection Act (FMIA) and the United States Department of Agriculture regulations (USDA) permit poultry to be used in combination with red meat in certain sausage products; while the Michigan Comminuted Meat Law permits the use of either poultry or red meat, but not a combination thereof in Grade 1 sausage; (2) federal law permits the use of certain meat by-products, cheese and soya products in various sausages, while Michigan does not permit such ingredients in Grade 1 sausage, although it does permit them in various other comminuted meat products; and (3) federal law subjects comminuted beef to a 30 percent fat limitation, and permits it to be called "ground beef", "hamburger" or with the addition of binders, extenders, or seasonings "beef patties" while Michigan law requires that comminuted beef be called "ground beef" if it contains not more than 20 percent fat, or "hamburger" if it contains not more than 30 percent fat and makes no provision for "beef patties". As the federal standards are designated as wholesome, Plaintiff argues that the truth of the language on the placard is irrelevant to the issue. Defendants assert that there is a legitimate state interest in consumer protection, and that they have a valid right

---

1. The parties recognized in their arguments on Count I that the issue of whether or not the language mandated by Michigan's placard requirement constitutes labeling is a very narrow one. In light of Section 678 of the Wholesome Meat Act which does not preclude a state from "making a requirement or taking other action, consistent with this chapter," I am of the opinion that this issue may very well present a mixed question of law and fact and I therefore invite supplemental briefs on this question.

to provide truthful notification to consumers to minimize confusion in the marketplace. Thus, Defendants assert that the federal standards merely assure a *minimum* uniformity and do not prohibit a state from enforcing higher ingredient and inspection standards for its intrastate producers and insuring that purchasers of meat products are informed of that fact.

Acknowledging that the Michigan requirement does not explicitly prohibit producers from selling non-conforming products, Plaintiff categorizes the sign as pejorative of the federal standards and cites *Best & Company v. Maxwell*, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940) for the proposition that the Commerce Clause forbids discrimination whether forthright or ingenious. Affidavits from Armour, Dubuque Packing, Hormel & Company, Libby, John Morrell & Company, Pierre Frozen Foods, Inc. state that, by vigorous enforcement of the sign requirements, Michigan has succeeded in restricting interstate flow of commerce in meat products. Plaintiff further alleges that Michigan has not only enforced Section 4a against the by-products that are deemed most offensive; i. e. snout, entrails, udders, etc., but also against soya protein or hydrolized vegetable protein or beef hearts, none of which ingredients are forbidden in all Michigan inspected meat products by the Michigan Comminuted Meat Law. Michigan does permit some of these by-products in certain specialty items which are clearly described as such. For example, head cheese, blood sausage and liver sausage utilize ingredients otherwise prohibited by the Michigan statute.

While emphasizing the position that Michigan's placard requirement is a *per se* prohibited discrimination against articles of commerce because of their out of state origin, Plaintiff also contends that Michigan has no significant local interest to protect which then permits a balancing of legitimate considerations.

■ I find after listening to oral argument and considering the record, that a final determination of whether Michigan does have a local interest to protect, and to require the balancing of legitimate interests of the State and the burdens on interstate commerce must await trial. I am not convinced that the manifest intent of Congress in enacting the Wholesome Meat Act is to prevent the consumer information that is provided by these placards. Plaintiff alleges that even if Michigan has a significant local interest, reasonable non-discriminatory alternatives exist to protect these legitimate concerns. Thus, Plaintiff acknowledges that Michigan has a right to inform its consuming public that Plaintiff's products conform to the federal standards and may contain ingredients deemed offensive by some. It is the manner in which this information is conveyed and its attendant effect on interstate commerce that form the basis of this dispute. It appears to me that there are potentially conflicting constitutional considerations to be evaluated in this action. Whether Michigan has adopted the placard for a legitimate rather than a protective purpose, whether Michigan has other alternatives which are reasonable and non-discriminatory and which do not impair the First Amendment right to free speech, and whether there is a substantial burden on interstate commerce to preclude consideration of local interests are questions to be answered after the facts are illuminated at trial.

■ Plaintiff, in oral argument, asserts that the truth of the Michigan placard requirement is irrelevant—that the discriminatory effect on commerce is the determinative factor for the Court to consider. However, I find that, while there are many facets of this issue to be considered before arriving at an ultimate conclusion, the factual basis for the language on the placard is significant. I find that, in all respects, a democracy is premised upon an educated citizenry, and that it is no less important for a citizen to have access to information about the quality of the food that he ingests than that he have access to information about political matters that may not so directly concern him. The Court is aware of the so-called "imported meat cases" in which several lower courts have found that,

while there is a truthful basis for labeling imported meat, there was no corresponding benefit to the public while there was an increased cost to the producers. *Tupman Thurlow Company v. Moss,* 252 F.Supp. 641 (M.D.Tenn.1966); *Ness Produce Company v. Short,* 263 F.Supp. 586 (D.Or.1966); *Armour and Company v. Nebraska,* 270 F.Supp. 941 (D.Neb.1967); *International Packers, Ltd. v. Hughes,* 271 F.Supp. 430 (S.D.Iowa 1967). It may well be that after trial on the merits, this Court will find that Michigan's statute unreasonably discriminates against interstate commerce and that there is no countervailing public policy reason to uphold the statute. Initially, however, it seems to me that consumer preference in this area is not an abstract interest, and that the analogy to the imported meat cases is largely inapplicable. With increased public emphasis on nutrition, a calorie conscious population, and with scientific debates occurring over the merits of various food additives, flavorings and preservatives, Michigan may well have utilized a reasonable measure to provide the consumer with essential information.

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

The Court may find, after litigation, that whatever putative incremental health benefits are ostensibly present in meat products conforming to Michigan standards are negligible when compared to the burdens imposed on interstate commerce. Indeed, the Court may find that Michigan's sign requirements are not only superfluous, but misleading. However, the Court is also aware that within one year after the publication of Upton Sinclair's *The Jungle,* Congress passed in 1906, its first law regulating meat, food and drug industries in an attempt to rectify the unappetizing and unwholesome practices of the producers since corrupt state officials would not address the problem. While the federal standards are considered "healthful" or "wholesome", health is not the absence of sickness or disease, but is really an optimum state of well being. In my opinion, it is singularly inappropriate to curtail a state's effort, if that should prove to be the case, to provide for the welfare of its people by not taking the path of least resistance and acquiescing to a minimum federal standard, but rather attempting to provide food products of higher quality so that consumers may exercise freedom of choice to eat products they deem to be of greater benefit to them. (At least the state will have the opportunity to produce evidence to that effect.)

■ Additionally, the consumer may well have a legitimate interest in avoiding products that have entrails, snouts, udders, etc. in them, even if there is no significant difference in nutritional content. Undoubtedly, some individuals may not care what a food product contains so long as it tastes good and is not harmful to them. For some consumers, however, the product may be offensive in that it contains items permitted under the federal standards, while other people may even consider these by-products to be delicacies. Great care must be taken before the Court impinges in any way upon an individual's freedom of choice and concludes that Congress has manifested an intent to regulate all aspects of the field. This is particularly true in light of the Sixth Circuit decision in *Armour and Company v. Ball,* 468 F.2d 76 (C.A. 6 1972), that while labeling and ingredient standards are preempted, Michigan may enforce its higher standards with respect to intrastate producers. Without a meaningful way of informing consumers at the market place of the difference between the two standards, maintaining higher standards for Michigan producers would be pointless.

The proofs may show that the Michigan standards are not "higher" as claimed but only "different". This result would surely affect consideration of whether Michigan had a legitimate safety or health interest to enforce. Defendants claim that the "Michi-

gan grade" designation has a reputation among consumers for nutritional, wholesome, and good tasting meat products and that Section 4a of the Michigan Comminuted Meat Law merely is an attempt to harmonize legitimate goals of consumer protection with the constraints imposed by the *Armour* decision. Plaintiff contends that Michigan's *vigorous* enforcement of Section 4a operates to insure that only Michigan's standards apply to the sale of meat in Michigan in violation of the preempted federal standards. (Emphasis supplied) It is entirely possible to conclude, in the alternative, that there has been no incentive to purchase a product meeting lower standards when the facts are known.

*Jones v. Rath Packing Company*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) requires consideration of the "relationship between the state and federal laws as they are interpreted and applied, not merely as they are written". As there is a material dispute between the parties over this issue, analysis of the application of the statute must be determined at trial. Plaintiff argues that the *Pike* test is not appropriate to this case as the effect of the Michigan statute has been to coerce producers into conforming to Michigan standards or to prevent them from selling in the Michigan market. The Court notes, however, that only a small fraction of the members of the American Meat Association are participating in this suit.[2] To date, Plaintiff has not shown that the prerequisites for invoking the *Pike* test do not exist as applied to this case: (1) even handed regulation to effect a legitimate public interest; (2) an incidental burden on interstate commerce; and (3) no excessive burden in relation to the local benefits.

■ There are many areas in which the states may exercise jurisdiction concurrently with Congress. Also, Congress never intended to cut the states off from legislating on all subjects relating to the health,

life and safety of its citizens. *Head v. New Mexico Board of Examiners in Optometry*, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963). Furthermore, the intention of Congress to preempt the field is not lightly conferred, especially where the public health and safety are concerned. To find a state law invalid under these circumstances, there must be such an inherent conflict that it is impossible to comply with both laws, or Congress must have manifested its intent to do so. *Florida Avocado Growers v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). *Florida Avocado Growers* holds that the supervision of the readying of foodstuffs for the market is a matter of peculiarly local concern, and that federal regulations by means of *minimum* standards of picking, processing and transportation of agricultural commodities, however comprehensive for those purposes that regulation may be, does not by itself import displacement of state control over distribution and retail of those commodities in the interests of consumers of the commodities within the state. (Emphasis supplied)

■ Plaintiff cites *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) for the proposition that a discriminatory effect on interstate producers in increasing the cost of out of state producers *vis-a-vis* local producers is prohibited. The Supreme Court in *Hunt* found that a North Carolina regulation requiring that all apples sold or shipped into North Carolina in closed containers bear no grade other than the applicable federal grade, or a designation that the apples were not graded, was discriminatory in that the statute compelled Washington shippers to obliterate Washington state grades from their North Carolina bound containers or to stop using preprinted containers. While the cost to out of state producers is obviously a factor to consider, as is the protective effect on local producers, I note that the Supreme Court in

**2.** Plaintiff represents approximately 275 meat producers in the United States, of which approximately 165 do business in Michigan. Seven of these producers claim to be adversely

affected by the provisions of the Michigan Comminuted Meat Act. (Plaintiff's answer to Interrogatory No. 1).

*Hunt* expressly permitted the designation of state standards as opposed to federal standards for goods shipped out of state. In this instance, the state is attempting to designate what products conform to federal standards for goods sold within the state. *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) provides that increased costs *per se* do not constitute an impermissible burden on commerce, but that costs along with other factors are relevant in determining whether there is indeed an undue burden on interstate commerce.

Both Plaintiff and Defendants rely on *Ray v. Atlantic Richfield Company*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). In *Ray*, the Supreme Court found that states could not impose different or stricter design requirements for tankers as Title II of the Ports and Waterways Safety Act (46 U.S.C. § 391a) (which mandates federal regulations issued to fix minimum standards for tanker design and construction) contemplated uniform national and international standards for tanker design and construction. However, Title I of the Act, which applied to tug requirements, authorized, but did not mandate, the issuance of federal regulations, and no federal regulations were promulgated. Thus, the Supreme Court found that Washington's requirement that tankers of specified weights, which did not conform to safety standards prescribed by statute, use tug escorts was permissible because the tug escort provision was not an indirect method of requiring tanker owners to comply with the invalid design requirement, and the record did not show that the cost of the tug escorts impeded the flow of interstate and foreign commerce. Whether the statute in this instance is analogous to an invalid design requirement in which national uniformity is mandated, or whether it is a matter of local concern which does not have the effect of requiring producers to conform to a preempted standard, and which has a minimal effect on the efficient flow of interstate commerce must be con-

sidered in the context of the interests involved. The federal government has historically played a greater role in maritime affairs than in the preparation of foods for consumption. *Florida Avocado Growers, supra.* In enacting the Wholesome Meat Act, Congress may have intended national uniformity. In light of the Sixth Circuit ruling in *Armour v. Ball*, however, this assumption will not be taken for granted, but must be proved on the merits. Therefore, Plaintiff's Motion for Summary Judgment is denied.