**AMERICAN MEAT INSTITUTE,**
**Plaintiff,**

v.

**Dale B. BALL, Replaced by Dean M. Pridgeon, Director of the Department of Agriculture of the State of Michigan and Edward C. Heffron, Chief of the Food Inspection Division of the Michigan Department of Agriculture, Defendants.**

**No. G 75–39.**

United States District Court,
W.D. Michigan, S.D.

Aug. 31, 1982.

J. Stanley Stroud, Washington, D.C., David VanderHaagen, Lansing, Mich., for plaintiff.

Henry J. Boynton, Asst. Atty. Gen., Lansing, Mich., for defendants.

John Smietanka, U.S. Atty., Grand Rapids, Mich., Ronald D. Cipolla, Asst. Gen. Counsel, Regulatory Div., Andrea Bateman, Regulatory Div., OGC, U.S. Dept. of Agriculture, Washington, D.C., J. Paul McGrath, Asst. Atty. Gen., Dennis G. Linder, Branch Director, Theodore C. Hirt, Attys., Civ. Div., Dept. of Justice, Washington, D.C., for amicus curiae U.S.

## OPINION

ENSLEN, District Judge.

Plaintiff, American Meat Institute, a national trade association of the meat packing industry, has charged that Section 4a of Michigan's Comminuted Meat Law, M.S.A. § 12.964(4.1) M.C.L.A. § 289.584a is unconstitutional.[1] AMI alleges that the placard requirement for certain comminuted meat products violates the Supremacy Clause by prescribing a labeling requirement that is "in addition to or different than" those specified in the Federal Meat Act, as amended by the Federal Wholesome Meat Act, 21 U.S.C. §§ 601–678 and by effectively enforcing ingredient standards different from those provided by the Wholesome Meat Act. The Complaint also alleges that Michigan's Comminuted Meat Law discriminates against out-of-state meat processors and imposes an unreasonable burden on interstate commerce in violation of the Commerce Clause.

As Count I, the labeling issue, involved a question of law, I have previously dismissed that count by summary judgment on the basis that the information did not "accompany" the article for sale as there was no common origin or destination. (*American Meat Institute v. Ball,* No. G 75–39 (W.D. Mich. December 1, 1981).) However, as material factual issues remained in dispute as to whether Michigan was merely protecting a legitimate state interest in a reasonable and non-burdensome way or whether the state had erected an impermissible commercial barrier, I denied summary judgment as it applied to violations of the Commerce Clause. Also, as the sale of products meeting the federal standards was not *per se* illegal under Michigan law, I concluded that determining whether the state had indirectly imposed an ingredient requirement in violation of federally preempted standards must await trial on the merits. (*American Meat Institute v. Ball,* 520 F.Supp. 929 (W.D.Mich.1981))[2] Consequently, the evi-

1. M.C.L.A. § 289.584a

(1) A person shall not sell or offer for retail sale a product which is not manufactured to the ingredient standards of this act unless the federal government preempts Michigan's ingredient standards. In that case federally inspected meats not meeting the ingredient requirements of this act must be prominently identified in the display area where they are offered for sale.

(2) The identification shall consist of a sign not less than 18 by 24 inches with the heading to read: 'The following products do not meet Michigan's high meat ingredient standards but do meet lower federal standards,' printed in letters not less than 1½ inches high. The name of the manufacturer or distributor and the specific name of that product shall be carried on the sign in letters not less than ½ inch high. All letters and numerals in the sign shall be in red on a yellow background.

(3) When sold or offered for sale from a retail sales display, vending machine, or bulk container, the required placard shall be clearly visible to a customer.

(4) When sold or offered for sale in a food service establishment or other public eating place, the required information must be on a placard as described above, or printed on a menu in type and lettering similar to, and as prominent as, that normally used to designate the serving of other food items.

2. Subsequent to the Summary Judgment disposition, trial by the Court took place December 7–21, 1981. This Opinion, then, constitutes my Findings of Fact and Conclusions of Law re-

dence adduced at trial pertains primarily to the accuracy, significance, and effect of the placard required for products not meeting Michigan standards, and a comparison of the federal standards as defined by the Federal Wholesome Meat Act with Michigan's ingredient standards.

While the Commerce Clause of the Constitution presumes an area of free trade among the several states, Congress never intended to cut the states off from legislating on all subjects relating to the health, life and safety of its citizens. Preparation of foodstuffs for market has traditionally been a matter of local concern. *Florida Avocado Growers v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Head v. New Mexico Board of Examiners in Optometry,* 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963). When an area has been preempted under the Supremacy Clause, as meat ingredient standards have been under the Federal Wholesome Meat Act, subject to an exception for intra-state processors, of course, a contradictory state law must be held invalid. However, the issue here has been whether the state through its placard requirement has indirectly achieved this effect which is not so easily discerned.

Throughout this litigation, Plaintiff has vigorously contended that Michigan does not have a legitimate health or safety interest in enforcing Section 4a of the Comminuted Meat Act. AMI also asserts that if the state does have a valid interest in providing consumer information at the marketplace, the placard is inadequate, ineffective, and inaccurate. As a result, Plaintiff believes that the Michigan statute cannot withstand the balancing test found in *Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) which permits a state to enforce a valid local interest if it does so reasonably and evenhandedly and does not unnecessarily and unduly burden interstate commerce. That the placard appears to distinguish quality or ingredient standards rather than place of origin is not determina-

tive. *Best & Company v. Maxwell,* 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940) prohibits discrimination whether forthright or ingenious. AMI has repeatedly asserted that by effectively preventing meat processors from marketing their products within the State of Michigan, the state legislature has exceeded the bounds outlined in the balancing test and has illegally imposed an ingredient standard. Finally, AMI claims that even if the state had a valid state interest to protect in enforcing Section 4a, and even if the placard requirement did not violate the Supremacy Clause by imposing an ingredient standard, Michigan can no longer legitimately publicize any apparent distinction between state and federal standards as the federal government now inspects Michigan processors. As might be expected, the United States Department of Agriculture (USDA) will only inspect to insure compliance with federal, not state, standards.

The Defendants have consistently maintained that the placard is neither discriminatory nor misleading, that the state has an important health and educational interest to protect, and have disputed AMI's contention that the federal standards in many ways are not only more restrictive or "higher" than the state standards but also that by exempting certain "ethnic" products from the placard requirement, the state exhibited a discriminatory purpose in enacting the legislation. Additionally, Defendants have continued to refute the contention that the federal inspection of meat processing plants in Michigan has negated any purported state interest, at least as of October, 1981, when the federal government assumed responsibility for inspections, by claiming that enforcement of 4a takes place at the retail rather than the processing level and that the consumer is still entitled to be informed of the different ingredient standards. Michigan also denies that it has enforced the Comminuted Meat Law in a haphazard and selective manner, but asserts that the State Department of Agriculture

quired by Rule 52 FRCP; and follows my review of the evidence produced at trial, and the

law.

continues a serious and committed effort to uphold the Act.

The United States, on behalf of the Department of Agriculture, has filed briefs with this Court as *amicus curiae*. While arguing that the placard is not a label, as defined by the statute and interpreted by the case law, the government does contend that Section 4a unduly burdens interstate commerce by creating a barrier to the sale of federally inspected meat and violates the Supremacy Clause by imposing Michigan ingredient standards on federally inspected meat. The government claims that the effect is the same as if the state were imposing civil and criminal penalties on meat processors who fail to meet Michigan's ingredient standards rather than providing for sanctions when these products are not placarded. Additionally, the government argues that since Michigan has decided to surrender inspection responsibilities over Michigan meat processing plants to the federal government as of October 1981, Michigan processors are now subject to federal inspection and the state cannot legitimately continue to enforce its additional or different requirements.

*Jones v. Rath Packing Company,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) requires consideration of the "relationship between the state and federal laws as they are interpreted and applied not merely as they are written." Although there are considerable distinctions between the two ingredient standards, I note at this point that testimony at trial has elicited the admission that the state has adopted a policy of conforming to the federal standards as they apply to the addition of non-fat dry milk in comminuted meat products and that similar alignment can be expected in enforcing the standards related to inclusion of tomato and egg products as a consequence of the USDA inspection of Michigan processing plants. Given this joint venture, and policy of accommodation, the state has a more difficult, if not an impossible burden to persuade the Court that it continues to have a significant interest to promote through Section 4a and that enforcement of the placard requirement is a proper exercise of the state police power.

As my denial of Plaintiff's Motion for Summary Judgment indicates, I believe that a consumer has the right to be informed of the nature and substance of the food he ingests. Nutrition, as well as the pleasure of the palate, affects the quality of life. I do not believe that the consumer must automatically be limited to the terms appearing on the label of the food package he buys to ascertain the ingredients in a product. Physicians, nutritionists, and educators, as well as state and federal health agencies, emphasize the increasing awareness of the importance of a balanced diet, the need to control caloric intake, and the effects of additives, preservatives, and processing methods associated with commercially prepared foods by providing the consumer with essential information about the elements of a healthy diet. It would be a paradox indeed to conclude that this information could not be presented in the marketplace or that the state legislature could not act in the public interest by providing accurate information to the consumer at the time of purchase.

> Plaintiff, in oral argument, asserts that the truth of the Michigan placard requirement is irrelevant—that the discriminatory effect on commerce is the determinative factor for the Court to consider. However, I find that, while there are many facets of this issue to be considered before arriving at an ultimate conclusion, the factual basis for the language of the placard is significant... It may well be that after trial on the merits, this Court will find that Michigan's statute unreasonably discriminates against interstate commerce and that there is no countervailing public policy reason to uphold the statute. (Opinion dated August 20, 1981.)

While there are indeed many factors to consider in resolving the constitutionality of Section 4a, which is the ultimate conclusion, the threshold consideration, the *sine qua non,* involves the factual basis for the placard. As I indicated when denying Plaintiff's renewed Motion for Summary Judgment:

Even though the information is not *per se* prohibited under the preemption doctrine because it does not constitute a label, it may be so inherently misleading as to create a substantial burden on commerce, or alternatively, even though truthful, the placard may be so inadequate to convey the essential product information to justify its use, that it has, in fact, the same effect as the courts have found in the imported meat cases; i.e. that while the information conveyed was factual, the result of the notice was to cause consumers to shun the product irrationally, without giving the beneficial product information to the consumer to assist him in making an informed choice. See *Tupman v. Thurlow,* 252 F.Supp. 641 (M.D. Tenn.1965). (Opinion December 1, 1981.)

While the essence of this lawsuit involves the right of the consumer to be adequately informed of the contents of the food he eats, including the right to make his determination on the basis of an aversion to certain by-products even if they are nutritious, the state cannot misinterpret, mislead, or create irrational prejudice under the guise of consumer protection. I well recognize that there are psychological aspects to qualifying terms such as "high" and "lower" and that people may reach different conclusions based upon the same facts. However, at the very least, this placard is vague and ambiguous. To the extent that a plain meaning of the placard can be ascribed, it is incorrect. Michigan standards are in fact "different" from the federal standards. The Michigan consumer may prefer them. There has been no showing based upon objective evidence, however, that the Michigan standards are generally higher than the federal standards. In fact, the contrary is true.

Without disputing the fact that the state may have a legitimate interest to protect, or that an individual consumer, even when sufficiently informed, may continue to feel that Michigan's ingredient standards are "high" and the federal standards "lower", the language mandated by the placard provides no basis for an educated consumer decision. Having failed in its attempt to demonstrate the truthfulness of the placard, the state has no viable reason to enforce Section 4a of the Comminuted Meat Law. Therefore, no further balancing is required as a placard posted without factual support constitutes an undue and unreasonable burden on commerce.

Before discussing the basis for my conclusion that the federal standards are in many respects more restrictive than the Michigan ingredient standards, and my overall impression that the placard is both misleading and prejudicial, and thus consequently discussing the merits of the case, I note that even one of the named Defendants charged with enforcing the Act, Dr. Edward C. Heffron, who impressed me at trial as being an able and dedicated public servant, did not recommend the specific language of the placard. Rather, Dr. Heffron would have preferred a sign which alerted the customer to examine the label or to inquire further about the product if he chose to do so.

From my examination of the documents, the testimony, and the placard itself, I am convinced that Dr. Heffron is correct: the language of the placard is not "the clearest language to have to get along with." A placard required to be exhibited in the public interest which obviously has a deterrent effect on consumers, must clearly address the matters of concern at the very minimum. After all, that is the reason for its existence. Having reviewed the record, I have the distinct impression that the legislative drafters acted precipitously and without a thorough analysis of the message actually conveyed to the consumer. I do not doubt that these legislators were convinced that Michigan standards guarantee a superior product and that the placard states a simple truth. The evidence at trial did not bear out this hypothesis.

While not presuming to exhaust the possible differences and relative values between the federal and Michigan standards, I have based my decision upon several major considerations, which in my opinion, preclude the blanket assertion that Michigan has "higher" standards for comminuted

meat products than does the federal government. The Sixth Circuit in *Armour v. Ball,* 468 F.2d 76 (C.A.6 1972) *cert. den,* 411 U.S. 981, 93 S.Ct. 2267, 36 L.Ed.2d 957 (1973) found that while the Michigan 12% protein requirement was higher than the 11.2% minimum under the federal act, in other conflicts the federal standards were more demanding. Since meat is presumably purchased and utilized for its protein content, this prior finding by the appellate court was not outcome determinative of the litigation as the placard does in fact address alleged high meat ingredient standards. As the trial progressed, however, it became increasingly apparent when viewing the evidence presented by both sides, that those differences discussed by the Sixth Circuit do deal with the critical issues involved and that, in the areas of primary concern, the federal standards are equally as stringent as Michigan standards, if not more so. Superiority in one area, such as higher minimum protein content, may conceivably outweigh inferior standards in other areas even though they are more numerous. In this case, it does not.

Plaintiff produced such a magnitude of factual support for its premise that in significant respects, the federal standards are superior to Michigan standards, that argument to the contrary would be difficult under any circumstances. The state did not effectively counter this factual analysis. For example, Mr. Albert Cunningham, senior staff scientist and food technologist in the United States Department of Agriculture's Products, Standards, and Labels Division compared the Michigan standards with the federal standards set forth in 9 CFR § 3319.140, 319.180. His findings, which Defendants were largely unable to rebut, were persuasive that the federal standards in many important categories were superior. Because the placard does not distinguish those Michigan comminuted meat products which objective analysis shows to be superior to products manufactured pursuant to federal standards from those products found to be inferior, it cannot withstand judicial scrutiny.

When comparing federal and state comminuted meat standards, one must even compare the definition of meat. Federal law defines "meat" as muscle tissue while Michigan law defines meat as "flesh" which includes any edible part of the carcass including fat. Under federal law, fat is a by-product and would have to be labeled as such. It is significant, in my opinion, that edible animal fat may be added to products without having to be labeled as a by-product under Michigan standards because Defendants have taken the position that bacterial loads and shelf life are important considerations in determining the quality of a meat product. Defendants state that Michigan standards are higher because inclusion of by-products affects both bacterial loads and shelf life. However, since it is difficult to determine the age of detached animal fat, the federal regulations achieve a higher standard insofar as they at least inform the consumer that the by-product exists even if the label does not state the relative age of the animal fat compared to the "meat" because the Michigan standard is totally silent on this point. The sophisticated consumer may suspect the possibility of a shorter shelf life for the product if he realizes the existence of added fat, but has no means to determine this if he remains uninformed of its existence. In other words, the consumer at least has the opportunity to obtain further information when the label provides inadequate notice, whereas Michigan law does not offer the consumer any assistance at all, regarding this ingredient, but creates through its placard requirement an inference that Michigan products contain higher quality meat. As this example illustrates, such an unqualified assumption is without foundation in fact.

There are other important differences. Michigan law includes head and cheek meat in its definition of "skeletal meat" while the federal law considers head and cheek meat to be by-products. Therefore, head and cheek meat are permitted in Grade 1 sausage under Michigan law but not under federal law. One of the contentions of the Defendants is that meat by-products are used under the federal standards. In this

instance, the difference appears to be semantic, rather than substantive, depending upon what is labeled as a by-product. As the meat ingredient is defined, however, the federal standard seems to be the more restrictive in limiting the part of the carcass that can be included without designating it on the label.

I do note Defendants' claim that salivary glands are included in the federal definition of head and cheek meat whereas they are excluded under Michigan law. In this particular case, since these items are not part of the ingredient components at all in the federal Grade 1 sausage, the distinction is immaterial. Thus, the placard typifies the dangers inherent in sweeping generalizations. Michigan may prohibit specific by-products in comminuted meat not classified as Grade 1 sausage and the placard may be technically accurate when applied to these specific products. Cumulatively, the placard claims too much.

In evaluating the placard's language, I have paid particular attention to the phrase "higher meat ingredient standards." The evidence at trial indicates that while the Michigan law requires 12% protein as compared to 11.2% under federal law, this does not necessarily result in "higher meat ingredients." Michigan, by statute at least, permits whole eggs, dried eggs, egg whites, egg yolks, and other egg products to be used in unlimited quantities in Grade 1 sausage. These items cannot be used under the federal regulations even if they are properly labeled although the federal law permits the use of other extenders such as soy (a vegetable protein.) As eggs have a highly concentrated form of protein, and are certainly nutritious, I do not determine whether the federal standard is more or less restrictive. I do regard the placard as inaccurate since the sign does not speak of "protein" but refers to meat ingredients.

Throughout this trial, Defendants have argued about the consumer's right to be sufficiently informed about the inclusion of specific by-products and have contended that the federal regulations both permit products prohibited under Michigan law and

fail to identify them when they are present. I cannot find any valid reason to support the placard when Michigan Grade 1 sausage may contain less meat than its federal counterpart even though that product may indeed be better or equally nutritious. The only ingredient specified in the placard is "meat." Presumably, the consumer purchases a meat product for its meat content. As the consumer may wish to know what other key ingredients are contained in a product for a variety of reasons, I find the placard to be deficient in that it literally invites the consumer to make a false comparison between the Michigan and federal standards. The sign neither refers to the quantity nor the quality of meat in a product nor provides any rational basis for making a comparison. If, in fact, Michigan is following most federal standards now that the USDA is inspecting state processing plants, this reinforces the lack of a meaningful distinction.

Much of the public concern over adopting the federal standards involves the inclusion of by-products or variety meats. Evidence at trial has shown that neither Michigan Grade 1 frankfurters nor a product labeled "frankfurter" under the federal standards may contain heart meat, tongue, or tripe. (Prior to 1972, lungs were a permitted by-product under federal standards but are no longer allowed.) If any by-products are used in cooked sausage, federal standards require the product to be labeled "with By-Products" or "with Variety Meats" and the specific by-product listed on the ingredient label in order of its percentage of the total product. While 9 CFR # 319.180(g) indicates that federal law permits pork stomachs or snouts; beef, veal, lamb, or goat tripe; beef, veal, lamb, goat, or pork hearts, tongues, fat, lips, weasands, and spleens, and partially defatted pork fatty tissue, or partially defatted beef fatty tissue, federal regulations do not allow liver cracklings, crackling meal, lungs, udders, spinal cords, salivary glands, brains, or ears in cooked sausage. I can well appreciate that the consumer may have a strong interest in knowing what by-products are included in sausage. I also find that an ingredi-

ent label may be unlikely to present that message to the consumer effectively because of the color and size of the print, the location of the label, and the obliteration of the message that may occur during handling. For purposes of this litigation however, I find that the Michigan placard does not rectify any lack of meaningful information, but merely substitutes one form of incomplete information for another.

Another distinction between Michigan and federal regulations involves the use of poultry meat in sausage products. Michigan allows an all-poultry meat sausage product but does not permit poultry to be mixed with beef and pork. The federal regulations permit a maximum of 15% chicken or turkey meat to be mixed with red meat in cooked sausage. Again, it may be extremely relevant to the consumer to be able to identify the inclusion of poultry in a product. For example, many individuals are allergic to poultry or egg products. An all poultry product such as a turkey frankfurter is readily identifiable while a product that the general public believes contains only red meat may conceivably cause problems if the product is not clearly labeled or the purchaser's attention is not drawn to the product's ingredients.

However, the placard does not fill the gap. Michigan standards may indeed be more restrictive in this regard as there is less likelihood that an individual would purchase a product with an unknown and unwanted ingredient than under federal law. For all practical purposes though, these differences cannot be deemed differences in degree or quality of the product, but merely as differences in kind which depend upon individual preference. The placard does not assist the consumer in identifying specific products on an ingredient label. It merely offers an unwarranted and paternalistic message that the Michigan product is better.

The federal standards compare favorably with Michigan standards for other comminuted meats as well as Grade 1 sausage. For example, Michigan would allow 40% heart, head and cheek meat in its chili con carne, while these products would constitute only 25% of the meat total in the federal product. Similarly, Michigan permits by-products in meat loaf as well as non-fat dry milk, eggs, macaroni, cheese, nuts, fruits, and gelatin, while federal law does not permit either by-products or extenders in meat loaf. Under federal standards, liver sausage must contain a minimum 30% liver content while the Michigan law sets no minimum. Michigan, or at least the law as it is written, also permits egg products in its liver sausage while they cannot be used under federal regulations. The federal law has more restrictive standards than Michigan for blood sausage as the federal requirement limits the use of extenders and binders while Michigan does not.

Although there has been extensive testimony about those products failing to meet Michigan's comminuted meat standards and the excessive burden on interstate commerce because of the inability of meat processors to market their products in this state, I find it highly relevant that products exist which would be acceptable under Michigan's Comminuted Meat Law but would not pass the federal test. In fact, Plaintiff has claimed that 47 cooked sausage products meeting Michigan Grade 1 standards failed federal inspection under the USDA standards during the period from June 1, to December 1, 1981. Significantly, Defendants have not refuted this argument, but have relied on the 0.8% differential minimum protein requirement between the Michigan and federal standards and the use of permitted by-products in claiming a superior standard. Such puffing has no place in an informational placard erected in the public interest. Even if Michigan standards are higher in some respects, for the reasons expressed previously, the placard is both misrepresentative and inadequate.

Most importantly, I am persuaded by the evidence at trial that the protein requirement also constitutes a difference without distinction. Dr. Mark Hegsted, a professor of nutrition and public health at Harvard for 35 years and now the Chief Scientist in the Nutrition, Science, and Education Divi-

sion of the United States Department of Agriculture, has testified that the 0.8% protein differential between federal and state standards has no nutritional significance as the average American consumes on the average twice the United States Required Daily Allowance. Dr. Hegsted has written numerous articles on nutrition and has served as a consultant to both the National Institute of Health and the World Health Organization and is well qualified to make such judgments. Although Dr. Hegsted contends that protein deficiency is unknown in the United States outside of hospitalized patients, there may be advantages in purchasing a product with a higher protein level even if it only amounts to a better value for a limited food dollar. However, Defendants' protein expert did not address protein requirements as it affected human nutrition, but rather considered protein as a "binder" or an element which improved the texture and consistency of the product. Obviously, while this factor is not irrelevant to the consumer, one cannot reasonably assume that the Michigan placard refers to the texture and consistency of a meat product when it implies that Michigan's meat ingredient standards surpass those of the federal government.

█ As Defendants did not address nutritional requirements, it is unnecessary to consider the fact that Michigan would not be able to distinguish its minimum protein level from that of the federal government because USDA requirements mandate that both be labeled as providing over 10% of the USDA. The federal restriction is intended to prevent the consumer from being exploited by insignificant differences. In view of the evidence at trial that except for the protein requirement, the bulk of the meat products passing federal standards would conform to the Michigan requirements, I must find Section 4a imposes an unreasonable and unacceptable commercial barrier.

Additionally, while the public furor has involved the issue of whether meat by-products may be used in Grade 1 sausage, those products cited by the state for containing illegal ingredients most often have contained soy and poultry meat. Thus, it appears, at least, that the primary distinction involves whether non-fat dry milk solids or egg products may be used in lieu of vegetable protein or poultry. The meat by-product most often cited by Defendants was heart meat. There has been testimony that this variety meat is as nutritious as skeletal meat. Most importantly, the placard does nothing to enlighten the consuming public about the existence of that particular by-product. A consumer may abhor one meat by-product but not all. Identification of by-products permitted under federal law but prohibited under state law may be justifiable under the *Pike v. Bruce Church* test as useful consumer information. Inflated claims cannot be so justified.

One of my concerns prior to trial related to the bacterial levels present in skeletal meat as opposed to those present in meat by-products or variety meats and the impact these differences could have on the quality of the meat product both before and after processing. Plaintiff has substantially eliminated that concern. Dr. Stephen Goodfellow, who has a doctoral decree in bacteriology from the University of Wisconsin and is the Vice-President and Technical Services Director of the American Bacteriological and Chemical Research Corporation, has stated the amount of bacteria appearing on an animal's muscles and organs directly relates to the amount of handling. Although it is true that skeletal meat is often handled less than organ meats, skeletal meat trimmings which are used in cooked sausage products are handled as much as organs and other by-products, according to the expert. Thus, the concern seems to be theoretical at best. Dr. Goodfellow stated, without contradiction, that the parts of the animal which can be expected to have the highest bacterial levels are head and cheek meat because they require extensive handling. These meat products are permitted under Michigan law in Grade 1 sausage.

Most important to me in determining that the difference in bacterial load does

not warrant major concern, is Dr. Goodfellow's conclusion that from a microbiological standpoint, there is no difference between the Michigan standards and the federal standards as bacteria present in sausage products are almost completely destroyed during the cooking process. He stated that while a sterile environment is not created, cooking the product reduces the bacterial level by a factor of 99.9 + %. As the differences appear to relate to the manner of processing rather than the specific by-product included in the product, and as inspection of processing plants is now under the direction of the federal government, Michigan's interest in supporting the placard requirement under this theory is *de minimus.* Although it is possible for certain virulent strains of bacteria to be harmful to the human population even in minute quantities, the Defendants have not shown any adverse impact on public health under federal regulation, or that Michigan products pose less risk to the consumer.

Even though the public has notice of some of the contents in "ethnic" foods permissible under Michigan law such as liver sausage and blood sausage, the fact that these products do not have to be placarded indicates that the state is really not greatly concerned with the possibility of bacterial contamination. If it were so concerned, logic would dictate an informational placard equally applicable to all products containing those ingredients. The state cannot presume that the purchaser of liver sausage, for example, is aware that bacterial levels may be higher than in other sausage even though it can assume that he does actually intend to purchase a product containing liver and may know from experience that the product has a shorter self life than other types of sausage.

As the placard does not further any legitimate state interest, in that it does not provide useful, accurate, or complete information, the statute cannot withstand challenge. Even though evaluating the merits of a product may involve consumer preferences which are psychological rather than scientific, the state cannot legitimately cater to psychological quirks through the use

of such an all-encompassing placard. The placard provides nothing in the way of beneficial consumer information nor does it encourage the customer to discover the exact differences between the Michigan and federal standards. Rather, it encourages just the opposite action by creating the misimpression that Michigan products are better in all respects. The courts have previously determined in the so-called "imported meat cases" that psychological preference as it relates to country of origin is not a basis to impede interstate commerce. *Tupman Thurlow v. Mosa, supra; Ness Produce Company v. Short,* 263 F.Supp. 586 (D.Or.1966); *Armour and Company v. Nebraska,* 270 F.Supp. 941 (D.Neb.1967). I cannot conclude that an ephemeral impression that Michigan's products are "higher" justifies a different result in this case. Only state interests of substantial importance can outweigh a devastating effect upon the free flow of interstate commerce. *Great Atlantic & Pacific Tea Company v. Cottrell,* 424 U.S. 366, 375, 96 S.Ct. 923, 929, 47 L.Ed.2d 55 (1976).

In light of the lack of persuasive rebuttal to Plaintiff's assertions that federal standards are equally effective in protecting the public interest, Michigan's putative state interest appears frivolous at best. As Michigan has not shown that it has a legitimate interest which cannot be adequately protected by less restrictive means, completion of the analysis under the *Pike v. Bruce Church* test is unnecessary. Whether or not Michigan intended the placard regulation as a protection for local meat processors, it has not shown that the ostensible state interest in the placard is based on more than speculation or conjecture. On the contrary, the state has shown that even though it asserts a legitimate state interest that would satisfy upholding the placard under a Commerce Clause challenge, it cannot verify when called upon to do so, any increased risk to the consumer if the placard requirement is abolished. Reasonable, nondiscriminatory alternatives certainly exist to protect the state's interest in informing the consumer of different ingredient standards under state and federal laws. *Hunt v. Washington State Apple Advertising Commis-*

*sion,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977).

As I have ruled that Section 4a presents an unreasonable restraint on commerce and thus violates the Commerce Clause, it is unnecessary to address its effect on preempted ingredient requirements under the Supremacy Clause.

## DECLARATORY JUDGMENT AND ORDER

Pursuant to the attached Opinion dated August 31, 1982, and in accordance with 28 U.S.C. § 2201;

IT IS HEREBY DECLARED that Section 4a of the Michigan Comminuted Meat Law, M.C.L.A. § 289.584a, M.S.A. § 12.-964(4.1) violates the Commerce Clause of the United States Constitution, Article 1, Section 8, Clause 3 by providing inaccurate and misleading information thereby creating an undue burden on interstate commerce.

IT IS ORDERED that the State of Michigan be enjoined from requiring signs, placards, and menu notices to be displayed pursuant to Section 4a of the Michigan Comminuted Meat Law.

As this action involved an important and complicated question of constitutional law, IT IS FURTHER ORDERED that each party bear its own costs.