ANIMAL LEGAL DEFENSE FUND
BOSTON, INC.

v.

PROVIMI VEAL CORPORATION.

Civ. A. 85–3113–MA.

United States District Court,
D. Massachusetts.

Jan. 14, 1986.

Steven M. Wise, Animal Legal Defense
Fund, Boston, Mass., for plaintiff.

Fox, Carpenter, O'Neill & Shannon, P.C.,
Milwaukee, Wis., Richard F. McCarthy,
Richard L. Binder, Willcox, Pirozzolo &
McCarthy, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

Disputes about food grow naturally out of our conviction that we are what we eat. This case, which questions the treatment of calves, illustrates this abiding and deeply-felt concern. The Animal Legal Defense Fund—Boston, Inc. ("ALDF"), is a non-profit charitable Massachusetts corporation whose members "promote animal welfare in purchasing their food." Convinced that calves raised for veal are mistreated, and that antibiotic drugs added to their feed endanger human health, the ALDF filed this action in Massachusetts state court. Defendant Provimi Veal Corporation ("Provimi"), a Wisconsin veal producer, buys calves raised by others in Massachusetts, slaughters them and sells the veal to meat distributors; Provimi's 1984 sales of veal in Massachusetts exceeded $1 million. Provimi also manufactures and sells pre-mixed and finished animal feeds and milk replacers. *See Provimi, Inc. v. United States,* 230 Ct.Cl. 621, 680 F.2d 111 (Ct.Cl.1982); *Bonda's Veevoederfabriek, Etc. v. Provimi, Inc.,* 425 F.Supp. 1034 (E.D.Wis.1977).

Based on the Massachusetts consumer protection statute, Mass.Gen.Laws Ann. ch. 93A, §§ 1–11 (West 1984), the ALDF complaint seeks an order obligating Provimi to tell retail consumers how the calves that Provimi buys are raised. Its members, the ALDF complaint alleges, do not want to buy veal from calves raised in this cruel

and unhealthful manner. Yet, because this information is not available to retail consumers, ALDF members have unwittingly bought and eaten Provimi veal. Other ALDF members feel they are unable to buy or eat veal at all.

The calves that Provimi buys in Massachusetts, the ALDF says, are raised in dark, confined pens; they are fed iron-deprived diets, which make them anemic so that their meat will be white rather than red. Their food also contains antibiotic drugs, such as penicillin and the tetracyclines, at dose levels below those required to treat an actual disease. These subtherapeutic doses are used to promote growth and to ward off disease.[1] Although Provimi does not raise its own calves, the ALDF contends that Provimi tells farmers how it wants them to be raised.

Provimi acts unfairly and deceptively because it does not tell consumers of its veal how the calves it buys are raised. Provimi buys "factory-farmed" veal calves that are "confined, intensively-raised [and] special-fed." Amended Complaint, ¶ 4. Such treatment is "cruel" and "fails adequately to meet the physiological and ethological needs of calves." *Id.* Members of the ALDF refuse to eat veal from calves raised this way because it would offend their "moral and aesthetic beliefs." Not telling consumers about this cruelty is unfair and deceptive, because it denies to consumers information they might consider important in deciding whether to buy Provimi's veal.

More complicated is the ALDF claim that Provimi ought to tell consumers that its veal might be unhealthful because it comes from calves that are fed antibiotics subtherapeutically. Bacteria immune to antibiotics flourish in animals whose feeds contain antibiotics. Resistance to antibiotics can pass from harmless bacteria in the animal's gut to other bacteria, such as salmonella, that can cause disease in humans. Resistant organisms passed to humans in meat render normal antibiotics ineffective against a wide range of infections. Patients may suffer prolonged illness or death while being treated with ineffective medicines. Consumers should be told about this health risk, the ALDF says, because it might influence their decision to buy veal; not telling them is unfair and deceptive.

The ALDF filed its complaint in Massachusetts state court in June, 1985. An amended complaint was filed a month later in July. Asserting diversity of citizenship, Provimi removed the case to this Court in August, 1985. 28 U.S.C. §§ 1441, 1332. Also in August, Provimi filed its answer, admitting that it buys calves and sells veal in Massachusetts, and that it does not disclose to consumers how those calves are raised. Provimi advanced numerous affirmative defenses which it now presses in its motion for judgment on the pleadings. Fed.R.Civ.P. 12(c). That motion is now before the Court.

The parties briefed the legal questions raised by the ALDF's amended complaint with vigor and at great length. Provimi filed a 46-page memorandum of law. In opposition, the ALDF filed a 93-page memorandum of law. Finally, Provimi responded with a 54-page reply brief.

Provimi raised numerous affirmative defenses in its answer and motion for judgment on the pleadings, but only two of them, pre-emption of the state law claim by federal law, and failure to state a claim on

---

1. Subtherapeutic, continuous application of antibiotics in feed animals is believed to promote faster growth, improve feeding efficiency, and limit disease outbreaks, particularly among animals kept in crowded, confined quarters. Therapeutic application of antibiotics is intended to treat disease, once detected, and is administered in larger doses than for subtherapeutic use. *United States v. An Art. of Drug Con. of 4,680 Pails,* 725 F.2d 976, 988 n. 27 (5th Cir.1984).

Exactly why and how subtherapeutic doses of antibiotics promote growth is not fully understood. Several explanations have been advanced. Antibiotics might increase an animal's metabolism. They might increase the rate at which the animal can absorb nutrients in its food. Most commonly accepted, it appears, is the theory that antibiotics limit subclinical diseases, those which may not cause evident symptoms but are nonetheless taxing to the animal. O. Schell, *Modern Meat,* at 11 (1984).

which relief can be granted, need be treated here.[2] For reasons explained more fully below, Provimi's motion must be granted and the ALDF amended complaint dismissed.

## I.

■ The ALDF alleges that calves, raised according to Provimi's instructions, are treated cruelly because they are kept in cramped pens and are ill-fed. Even if the ALDF is right, however, chapter 93A is an inappropriate remedy. The cruel treatment of animals violates criminal statutes which are enforced by public officials, not private organizations, no matter how well-intentioned.

Cruelty to animals is a crime in Massachusetts. *See e.g.,* Mass.Gen.Laws Ann. ch. 272, §§ 77, 78A, 81, 85A (West Supp. 1985). These statutes are "directed against acts which may be thought to have a tendency to dull humanitarian feelings and to corrupt the morals of those who observe or have knowledged of those acts." *Knox v. Massachusetts Society for the Prevention of Cruelty to Animals,* 12 Mass.App. 407, 409, 425 N.E.2d 393 (quoting *Commonwealth v. Higgins,* 277 Mass. 191, 194, 178 N.E. 536 (1931)). Like nearly all criminal laws, these anti-cruelty statutes are enforced by public law enforcement officials. Mass.Gen.Laws Ann. ch. 272, § 84 (West 1970). *See Quinn v. Aetna Life & Cas. Co.,* 482 F.Supp. 22, 29 (E.D.N.Y.1979), *aff'd,* 616 F.2d 38 (2d Cir.1980). Cruelty to animals is an offense "against public morals, which the commission of cruel and barbarous acts tends to corrupt," *Commonwealth v. Turner,* 145 Mass. 296, 300, 14 N.E. 130 (1887). It is true that officers of the Massachusetts Society for the Prevention of Cruelty to Animals, a private charitable and benevolent organization, *Massachusetts Society for the Prevention of Cruelty to Animals v. Boston,* 142 Mass. 24, 27, 6 N.E. 840 (1886), do enforce these anti-cruelty statutes, but only when they have been appointed special police officers by the Commissioner of Public Safety. Mass.Gen.Laws Ann. ch. 147, § 10 (West Supp.1985). *See also* Mass. Gen.Laws Ann. ch. 129, § 9 (West Supp. 1985) (agents of the Massachusetts Society for the Prevention of Cruelty to Animals can inspect slaughterhouses, pet shops, guard dog businesses, hearing dog businesses and horse stables in order to enforce anti-cruelty and disease statutes).

It is also true that the ALDF does not, in the strict sense, try to enforce Massachusetts' criminal anti-cruelty statutes. It concedes it has no authority, as a private charitable organization, to do so. Instead, the ALDF insists that the Massachusetts consumer protection law gives concerned consumers a private right of action when violations of the anti-cruelty statutes affect them as consumers. Consumers have a right to know that veal sold to them comes from cruelly mistreated calves; Provimi's failure to give consumers that information, not the cruel treatment itself, is the unfair and deceptive trade practice in violation of chapter 93A. As adroit and skillful as this argument is, it is misdirected.

What makes Provimi's nondisclosure an unfair and deceptive trade practice is that it keeps consumers from knowing about a criminal violation, namely a violation of section 77. Not disclosing how calves are raised is deceptive, says the ALDF, because would-be veal buyers, including those who belong to the ALDF, might consider the criminally cruel treatment of calves

---

**2.** Provimi also contends that the ALDF lacks standing to litigate its concerns, that it did not send Provimi a demand letter before filing suit as required by the Massachusetts consumer protection statute, and that it did not join indispensable parties—the farmers who actually raise the veal calves Provimi buys. A good deal of the briefs is devoted to the standing question.

Although today's ruling assumes standing, it does not decide that difficult question. Nothing in this decision is meant to suggest that the ALDF's concerns about eating veal from mistreated calves, or about the health risks of feeding antibiotics subtherapeutically to livestock, are sufficient, or insufficient, to satisfy the constitutional standing requirements. U.S. Const., Art. III, sec. 2, cl. 1. The same holds true, of course, for the other affirmative defenses raised by Provimi but not decided here.

raised for veal "relevant information," 940 C.M.R. 3.05(1), or a fact "the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction ..." 940 C.M.R. 3.16(2). An ALDF victory in this action would have an unmistakable effect: to enforce by means of an injunction obtained in a private lawsuit, a criminal statute enforceable only by public prosecutors and, in legislatively-sanctioned circumstances, private groups, among which the ALDF is not numbered.

Relying on the decision in *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 365 N.E.2d 802 (1977), the ALDF argues that chapter 93A creates a private remedy for violations of other statutes which themselves do not provide for private enforcement actions. This reliance is misplaced, however. *Dodd* held that private plaintiffs could base a chapter 93A action against an insurance company on violations of a second statute regulating unfair and deceptive insurance practices. That statute, Mass. Gen.Laws Ann. ch. 176D, did not provide for private actions and contemplated enforcement by the Commissioner of Insurance. *Dodd*, however, turned on a saving clause in chapter 176D providing that it did not "relieve or absolve any person ... from any liability under any other laws of this commonwealth." *Dodd* also concerned two regulatory statutes, both intended to protect consumers. "The mere existence of one regulatory statute," the *Dodd* court reasoned, "does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter." *Id.* at 78, 365 N.E.2d 802. Notably, chapter 93A was amended, following *Dodd,* and now explicitly provides that violations of chapter 176D can be enforced in a chapter 93A private action. *See Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 674–75, 448 N.E.2d 357 (1983).

However well-intentioned it is, the ALDF is pursuing its goals along an improper avenue in this litigation. If convinced it has uncovered gross and systematic mistreatment of animals, the ALDF should concentrate its estimable advocacy urging public officials and the designated private animal protection organizations to proper action.

## II.

The ALDF is also disturbed about what calves are fed and not fed. Calves raised for veal, like many food animals, eat medicated animal feeds which contain subtherapeutic levels antibiotic drugs believed to promote growth. Humans who consume meat from these animals, the ALDF fears, also ingest bacteria resistant antibiotic drugs. Such bacteria can cause serious illness, difficult to treat because normally effective antibiotic drugs would be useless. According to the ALDF, iron is omitted from the diet of calves so the veal will be pale and white rather than red.

The ALDF claims that calves raised on this antibiotic-rich, iron-deprived diet yield veal that is adulterated and unwholesome in violation of federal and Massachusetts regulations. Selling such veal violates chapter 93A because it is an unfair trade practice not to comply with a Massachusetts public health statute or regulation, 940 C.M.R. 3.16(3). Similarly, it is an unfair and deceptive trade practice to violate any federal consumer protection statute. 940 C.M.R. 3.16(4). And not disclosing to consumers of veal that calves are fed antibiotic drugs is unfair and deceptive because it is important information that should be available to a consumer choosing whether to purchase veal. 940 C.M.R. 3.05(1), 3.16(2).

■ It is unnecessary to reach the merits of the ALDF's claims, however, because they are pre-empted by the comprehensive federal scheme regulating the labeling, packaging and marketing of meat and the use of medicated animal feeds. The ALDF's concerns are well-founded and quite serious. But this action, brought under a state consumer protection law, is an inappropriate remedy, and the ALDF's complaint must, therefore, be dismissed.

Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state law claims, whether they are based on statute, regulation or common law, may be pre-empted in several circumstances. "First, when Congress, in enacting a federal statute has expressed a clear intent to pre-empt state law; second, when it is clear, despite the absence of explicit pre-emptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby left no room for the States to supplement federal law; and, finally, when compliance with both state and federal law is impossible." *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (citations omitted). *Accord Michigan Canners and Freezers Ass'n v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984). The ALDF wrongly suggests that federal regulations are to be given less pre-emptive weight than federal statutes. "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings and Loan Assn. v. De La Cuesta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982). The ALDF's claim is based on the Massachusetts consumer protection statute and not on conflicting state regulations but that does not avoid pre-emption. "[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be a potent method of governing conduct and controlling policy." *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 781, 3 L.Ed.2d 775 (1959); *see Cipollone v. Liggett Group, Inc.,* 593 F.Supp. 1146, 1151 (D.N.J.1984).

The federal statutory and regulatory scheme involved here entails two federal statutes and two federal agencies. Food labeling generally is governed on the federal level by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–392 (West Supp.1985), and its regulations, which come under the administrative aegis of the Food and Drug Administration ("FDA").

Medicated animal feeds and drugs used in treating animals which are raised for human consumption are also controlled by the FDCA as part of its comprehensive scheme to protect the public from drugs that may be unsafe or ineffective for their intended uses. *See United States v. An Art. of Drug Con. of 4,680 Pails,* 725 F.2d 976, 978 (5th Cir.1984); *International Nutrition v. U.S. Dept. of Health,* 676 F.2d 338, 339 (8th Cir.1982); *Agri-Tech, Inc. v. Richardson,* 482 F.2d 1148, 1150–51 (8th Cir.1973). "New animal drugs," must be approved by the Food and Drug Administration before they can be lawfully marketed. 21 U.S.C. § 360b(a)(1)(A). The FDA can refuse to approve a New Animal Drug Application if the drug is proven not safe, 21 U.S.C. § 360b(d)(1)(A) & (B), or that "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 360b(d)(1)(E).

A drug that is not a "new animal drug" can be marketed without FDA approval. For a drug not to be considered a new animal drug, it must be "generally recognized" by qualified experts as safe and effective for each of its intended uses. 21 U.S.C. § 321(w).

Animal feeds that contain antibiotics are treated in a separate category parallel to new animal drugs. 21 U.S.C. § 321(x). Medicated animal feeds must also win FDA approval, apart from approval of the animal drug itself, before they can be marketed. 21 U.S.C. § 360b(m).

Meat and meat food products shipped in interstate commerce are regulated by the Federal Meat Inspection Act, as amended by the Wholesome Meat Act, 21 U.S.C. §§ 601–695 (West Supp.1985)("FMIA"), and its regulations. The FMIA is administered by the United States Department of Agriculture ("USDA"). Enacted in 1907, the FMIA ensures that the "health and welfare

of consumers [is] protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602.

Combined, the FDCA and the FMIA form a comprehensive regulatory scheme intended to "protect the health and welfare of consumers and to prevent and eliminate burdens on commerce by assuring that meat and poultry products are wholesome and properly labeled." *See e.g., American Public Health Assn. v. Butz,* 511 F.2d 331, 332 (D.C.Cir.1974); *National Pork Producers Council v. Bergland,* 631 F.2d 1353, 1361 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 335 (1981).

The ALDF insists that Congress did not intend to entirely exclude all state regulation of food labels and animal drugs; that Congress was not concerned about bacteria in meat; and, that requiring a notice or label or warning "concerning the potential harmful effects of the genetically-altered" bacteria possibly contained in veal, would not conflict with federal regulations. I cannot agree, and for the reasons explained below, must conclude instead that the ALDF's chapter 93A claim is pre-empted by the federal regulatory scheme.

First, to the extent the ALDF's amended complaint is based on violations of the FDCA or the parallel Massachusetts statute, Mass.Gen.Laws Ann. ch. 94, § 186—which deem adulterated, food containing "any poisonous or deleterious substance which may render it injurious to health"—it is pre-empted. The ALDF says that Provimi violates the FDCA because it sells adulterated veal. It is true that veal containing salmonella bacteria resistant to antibiotics is adulterated, within the meaning of the FDCA. *Continental Seafoods, Inc. v. Schweiker,* 674 F.2d 38, 43 (D.C.Cir.1982). Diseases caused by drug-resistant bacteria may be prolonged and serious. A recent Centers for Disease Control study traced an outbreak of human food poisoning caused by salmonella bacteria resistant to several common antibiotics, to calves fed subtherapeutic doses of antibiotics. Holm-berg, Osterholm, Senger & Cohen, 311 New Eng.J. of Med. 617 (1984).

But there is no allegation in the ALDF's complaint that Provimi has sold veal in Massachusetts contaminated with antibiotic-resistant salmonella. More important, the ALDF complaint fails to state a claim on which relief can be granted because no private right of action can be implied under the FDCA. *Pacific Trading Co. v. Wilson and Co.,* 547 F.2d 367, 370–71 (7th Cir.1976); *Nat. Women's Health Network v. A.H. Robins Co.,* 545 F.Supp. 1177, 1178 (D.Mass.1982). Even assuming, for the moment, that the ALDF can show that Provimi violates the FDCA because its veal is adulterated, the state law authority for the injunctive relief it seeks—the Massachusetts consumer protection statute—is pre-empted by the FDCA. "A private right of action is equally inconsistent with the federal regulatory scheme, whether the right is based in federal or state law." *Nat. Women's Health Network,* 545 F.Supp. at 1181. Massachusetts cannot confer on private persons the power to enforce a federal statute whose enforcement Congress left to federal administrative agencies. Nor can the ALDF enforce chapter 94, the Massachusetts statute which parallels the FDCA, in a private action under the Massachusetts consumer protection protection statute.

The same reasoning applies to the ALDF's claim that Provimi's veal is adulterated because calves are not fed iron. Iron, the ALDF argues, is a "valuable constituent" of veal; its absence renders veal an adulterated food. 21 U.S.C. § 342(b)(1). Nothing in the ALDF's brief suggests why veal must contain iron—it is the value of iron to humans that is important here, and not whether healthy calves require iron. Even assuming the ALDF is correct, however, this violation of the FDCA cannot support a private action under the Massachusetts consumer protection statute.

Second, the subtherapeutic and therapeutic use of antibiotics is controlled by a complicated and comprehensive federal statutory and regulatory scheme. Chapter

93A does not apply to "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the Commonwealth or of the United States." Mass.Gen.Laws Ann. ch. 93A, § 3. Antibiotic use in animals that complies with the federal scheme does not violate the Massachusetts consumer protection statute. Nowhere in its pleadings does the ALDF allege that either farmers or Provimi fail to comply with the federal statutory and regulatory scheme.

Even if the ALDF avoided this exemption, however, the comprehensive federal statutory and regulatory scheme pre-empts any injunctive relief under chapter 93A. The FDCA and its regulations establish complicated procedures by which new drugs proposed to be used in treating animals both subtherapeutically as feed additives and therapeutically, are approved before they can be marketed. Human safety is specifically considered, because it is in animals raised for food that these drugs and feeds will be used. 21 U.S.C. § 360b(d)(2). "The edible products of food-producing animals treated with such drugs" can contain only certain trace amounts of the drugs. 21 C.F.R. § 556 (1975). Further, regulations promulgated by the Secretary of Agriculture under the FMIA provide that all livestock slaughtered for human consumption shall be inspected before and after slaughter, to assure that these antibiotic levels are not exceeded. 9 C.F.R. §§ 309.16, 310.21 (1984). Food that contains approved animal drugs "or any substance formed in or on the food because of [the approved

drug's] use" cannot be found to be adulterated. 21 U.S.C. § 360b(k).

The risk of antibiotic-resistant bacteria, the ALDF's particular concern, is not ignored in these regulations. In the early 1970s, the FDA assembled an Antibiotic Task Force to study the widespread subtherapeutic use of antibiotics in food-producing animals. That group recommended extensive further studies to assess the risk of an increase in antibiotic-resistant, bacterially-induced disease in humans or animals due to use of antibiotics as feed additives. In 1973, acting on the task force's advice, the FDA published 21 C.F.R. § 135.-109 (since renumbered 558.15). The regulation proposed to revoke FDA approval for subtherapeutic use of antibiotics in two years unless data were submitted "which resolve conclusively the issues concerning their safety to man and animals." *See United States v. An Art. of Drug Con. of 4,680 Pails*, 725 F.2d at 978–81. Studies of resistant salmonella are specifically called for. Drugs and animal feeds which were already approved were allowed to remain on the market while this testing was performed.

Thus, the federal statutory and regulatory scheme fully controls the use of antibiotics in animals, including possible health risks to humans. While it is true that the FDCA does not contain explicit pre-emptive language, Congress' intent to occupy the field of antibiotic use in animals, and to direct the States to leave all regulatory activity in that area to the federal government is clear. *See Fidelity Federal Savings & Loan Assn. v. De La Cuesta*, 458 U.S. at 153, 102 S.Ct. at 3022.[3]

---

3. The ALDF, relying on *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), contends that the supervision of food for market has always been deemed a matter of peculiarly local concern. This suggestion obscures more than aids. *Florida Lime & Avocado Growers* involved a challenge to a California statute imposing a different maturity standard on avocados than the federal standard. The Court noted that the federal regulation set simply a minimum level of maturity for picking but did not prevent California's control over sale of avocados in the interests of California consumers. *Id.* at 145, 83

S.Ct. at 1219. "Congressional regulation of one end of the stream of commerce," the Court reasoned, "does not, *ipso facto*, oust all state regulation at the other end." *Id.*

The federal scheme here does not simply set minimum standards and invite the States to demand higher standards for its consumers. No distinction can be made between federal control of production or processing of meat and control by the States of its retailing. The federal concern in *Florida Lime & Avocado Growers* was "no more than to invite farmers and growers to get together ... to work out local harvest-

Finally, the ALDF cannot escape the preemptive reach of the federal statutory and regulatory scheme by asking for an injunction simply obligating Provimi to tell consumers that the calves it buys are fed antibiotics subtherapeutically.

The ALDF wants Provimi to display on its "label or packaging" a "warning concerning the potential harmful effects of the genetically-altered salmonellae, or information that concerns the manner in which the veal calves were raised or procured." Even assuming chapter 93A provides a basis for such a warning, it is plainly preempted by the federal regulatory scheme.

■ First, antibiotic use is thoroughly regulated by the FDCA. When Congress has fully occupied a field of regulation, even non-conflicting state regulation is preempted. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. at ——, 104 S.Ct. at 2700. Second, the ALDF's proposed warning is pre-empted by the FMIA which controls the labeling and packaging of meat and meat food products.[4] Unlike the FDCA, it contains explicit pre-emption language; it permits some concurrent state regulation, but prohibits state "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those" mandated by federal law. 21 U.S.C. § 678. The Secretary of Agriculture is authorized to prescribe "definitions and standards of identity or composition" for meat and meat food products which must be consistent with those prescribed under the FDCA. 21 U.S.C. § 607(c)(2). Meat and meat food products cannot be labeled until they have been inspected; inspections before and after slaughter assure that antibiotic tolerances set by the FDCA are not exceeded. 9 C.F.R. §§ 309.16, 310.21.

Federal law does not require meat and meat food product labels to carry a warning or an explanation about the subtherapeutic use of antibiotics. The ALDF seeks to impose requirements "in addition to or different than the federal requirements." *See Grocery Mfrs. of America*, 755 F.2d 993 at 1002. It is true, as the ALDF con-

ing, packing and processing programs" to relieve depressed marketing conditions. *Id.* at 150, 83 S.Ct. at 1221. California's concern was to keep immature avocados and avocados which would never ripen because picked prematurely, out of the retail market. Here, there is a single concern: namely, the safety and effectiveness of subtherapeutic use of antibiotics in food-producing animals.

**4.** The ALDF relies on *American Meat Institute v. Ball*, 550 F.Supp. 285 (W.D.Mich.1982), arguing that a State can require sellers to tell consumers that federally inspected meats do not meet its own meat standards. At issue in *American Meat Institute* was a Michigan law requiring a retailer selling meats which did not meet Michigan standards to display a placard. The placard told consumers that the product did not meet Michigan's "high" standards, but did meet "lower" federal standards. The ALDF's reliance is misplaced.

First, the placard law escaped pre-emption because Michigan required only a placard displayed near the meat products and not a warning or explanation on the product's label or packaging. The ALDF, in its brief, says it wants this Court to rewrite meat labels and packaging. Moreover, the placard law did not survive commerce clause scrutiny; the law provided inaccurate and misleading information to consumers and therefore its burdensome effect on interstate commerce was unjustified. *Id.* at 294.

Second, *American Meat Institute* involved a state statute directly concerned with meat, and not a broad consumer protection law. The difference is important. While Congress may leave to the States the power to supplement its regulations, such regulation is also tested under the commerce clause. A State cannot unreasonably burden or discriminate against interstate commerce; the State must demonstrate a legitimate state interest. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 152–54, 83 S.Ct. 1210, 1222, 10 L.Ed.2d 248 (1963). All of this requires deliberate weighing of different and often conflicting interests.

Subtherapeutic use of antibiotics undeniably promotes faster and more efficient production of meat. It may also pose a health risk, but how great a risk and whether it is justifiable is another matter. And if there is a risk, how best to control it? Should antibiotics be banned from use in animals, or should their use be restricted? Perhaps a warning to consumers similar to that required on cigarette packages is adequate. Questions of this sort can never, finally, be decided. They are questions of policy. A different question might be presented if Massachusetts had enacted a warning requirement similar to that in *American Meat Institute*. But even if the pre-emption hurdle is cleared, the ALDF asks this Court to do what it is singularly ill-suited to do.

tends, that Massachusetts can enact meat laws aimed at protecting the health and well-being of its citizens. *Mario's Butcher Shop & Food Center,* 574 F.Supp. 653 at 655. Preparation of foodstuffs for market has traditionally been a matter of local concern. *American Meat Institute v. Ball,* 550 F.Supp. 285, 287 (W.D.Mich.1982), *aff'd sub nom., American Meat Institute*

*v. Pridgeon,* 724 F.2d 45 (6th Cir.1984). Still, meat ingredient standards, labeling and packaging have been pre-empted by the FMIA, *id.,* and states cannot impose different or additional affirmative requirements on meat and meat food products. *Mario's Butcher Shop & Food Center,* 574 F.Supp. at 655.[5]

5. This decision is reached on the narrow ground of federal pre-emption. It does not minimize the serious risk that resistant germs, immune to antibiotic medicines, could grow in drug-fed animals and spread to humans where they could cause diseases that could not be treated with normally effective antibiotics.

The practice of feeding antibiotics subtherapeutically to food-producing animals is widespread. Most of the pork, and much of the beef and poultry produced in the United States is raised on feed treated with antibiotics. N.Y. Times, Sept. 16, 1984, at A1, col. 5. If, as many suspect, this is creating transferable drug resistance in animal bacteria that is showing up later in human bacteria, it is cause for concern. The vulnerability of disease-causing bacteria to antibiotics is a resource, just as much as unpolluted air and water, which, as we consume it by the use and misuse of antibiotics is diminished. A 1978 report by the World Health Organization warned that "[o]utbreaks of infection due to drug-resistant organisms are an increasing problem in both the developing and developed countries," and blamed the problem on "the widespread and indiscriminate use of antimicrobial drugs in man and animals." O. Schell, *Modern Meat,* at 18 (1984).

Whether, and how, to regulate the use of antibiotics as animal-feed additives is a difficult and fractious public health issue, of course. The livestock and pharmaceutical industries say that the undeniable benefits of the antibiotics in fattening livestock—which can mean greater efficiency and thus lower meat costs to consumers—are too great to abandon medicated feed without solid evidence. Even if antibiotics are eliminated from animal feed, they add, their widespread use and misuse to combat infections in animals and humans alike would permit the continued evolution of resistant bacteria. Critics of the virtually unrestricted subtherapeutic use of antibiotics say the evidence demonstrating animal-to-human spread of disease from resistant bacteria does exist and is unmistakable. Moreover, alternatives for growth promotion in food animals are available. Levy, 311 New Eng.J. of Med. 663 (Sept. 6, 1984).

Following a prolonged outbreak of salmonellosis in the sixties, the British government convened a committee to determine whether to regulate the use of antibiotics as animal-feed additives. In 1971, Britain sharply restricted the use of antibiotics in livestock feed, and a

number of other European countries have adopted similar restrictions. Schell at 106.

Congress and the federal regulatory agencies are not ignorant of the dispute, but repeated efforts to curtail or eliminate the use of antibiotics as animal-feed additives have failed. In 1977 the Food and Drug Administration proposed to regulate the unrestricted use of the most common antibiotics in animal feeds by making their sale and use contingent on veterinary prescription. *Id.* at 28. The FDA began proceedings to withdraw its approvals for the use of subtherapeutic levels of penicillin and the tetracyclines in animal feed. *See United States v. An Art. of Drug Con. of 4,680 Pails,* 725 F.2d 976, 988–89 (5th Cir.1984). Congress blocked the move and directed the FDA to wait until further scientific studies were completed. Critics say that influential farm-state legislators led the opposition, at the urging of the livestock and pharmaceutical industries. N.Y. Times, Sept. 16, 1984, at A1, col. 5. The National Academy of Sciences Committee to Study the Human Health Effects of Subtherapeutic Antibiotic Use in Animal Feeds, in 1980, recommended that further study be done. Schell at 108. Two studies contracted for by the FDA are now being reviewed. Reportedly, the FDA is considering whether to renew the proposal for a ban on antibiotics in animal feed following a Centers for Disease Control study tracing an outbreak of human food poisoning to antibiotic-resistant germs from beef cattle fed subtherapeutic antibiotics in their feed. N.Y. Times, Sept. 16, 1984, at A1, col. 5. Two months ago, however, the Secretary of Health and Human Services denied a petition seeking to have the subtherapeutic use of penicillin and the tetracyclines declared an imminent hazard, 21 U.S.C. § 360b(e), and approval for the new animal drug applications for that use immediately suspended.

Apparently frustrated with Congress and the FDA, the ALDF brought this action under the Massachusetts consumer protection statute hoping, apparently, to force the federal government's hand. The ALDF could well be concerned about the federal government's ability and eagerness to oversee and regulate the animal drug and livestock industries. Such concern is justified, as evidenced by a recent study prepared by the House Government Operations subcommittee on inter-governmental relations and human resources, which reports grave deficiencies on the part of the Food and Drug Ad-

## Conclusion

On this record, the defendant is entitled to judgment on the pleadings. Accepting all of the well-pleaded, material facts alleged in the complaint, there is no cause of action stated for which this Court can grant relief.

Accordingly, the complaint is to be dismissed.

SO ORDERED.

ministration in monitoring the use of toxic drugs and nutrition supplements in raising livestock. N.Y. Times, Jan. 13, 1986, at A1, col. 3. While the ALDF's impatience may be understandable, its new tactic cannot succeed. The FMIA and the FDCA evince Congress' intent to control the use of antibiotics in animal feed and this complaint cannot get around that fact. As stated earlier, the ALDF should bring its considerable influence to bear when Congress and the FDA face the question of transferable drug resistance from food animals to humans.